EQUISTAR CHEMICALS,
L.P., Appellant,

v.

DRESSER–RAND COMPANY, Halli-
burton Company, and Ingersoll–
Rand Company, Appellees.

No. 14–02–00874–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 13, 2003.

Rehearing Overruled Jan. 15, 2004.

Claudia Wilson Frost, Keith Duane Jaasma, Houston, Thomas Hal Cook Jr., and Richard G. Urquhart, Dallas, for appellants.

Thomas C. Wright, William Book and Chad M. Forbes, Houston, for appellees.

Panel consists of Chief Justice SCOTT BRISTER and Justices ANDERSON and SEYMORE.

## OPINION

SCOTT BRISTER, Chief Justice.

Equistar Chemicals, L.P. sued Dresser–Rand Company[1] for damages resulting from the failure of two impellers, integral components in two large compressors Dresser sold to Equistar's predecessor in 1975.[2] The trial court denied Dresser's motions for summary judgment and judgment notwithstanding the verdict based on limitations. At trial, a jury found Dresser liable (under strict liability, negligence, and breach of warranty theories), assessed damages at more than $3.6 million, and apportioned 80% of fault to Dresser. Finding all but a minor part of Equistar's claims barred by limitations, we reverse.

### Background

Equistar's Channelview olefins plant uses two charge gas compressors in the production of ethylene and propylene, chemicals used in the production of antifreeze and plastics. As part of that process, each of the Dresser units compresses a gas stream using an impeller—a rotor around which seventeen large blades spin. Both the compressors and impellers were intended to run constantly at high rates of speed for many years.

After many years of successful operation, Equistar's predecessor decided to boost production in 1989 by installing larger impellers, which were also bought from Dresser. In July 1991, again in December 1993, and a third time in March 1995, part of an impeller broke off, damaging and shutting down a compressor. Consultants suggested at least three possible causes: corrosion (from chemicals in the gas stream), welding defects, and resonance.[3]

To address this recurring problem, the impellers were reduced to their original size in 1996, and specially treated to reduce corrosion and strengthen their

1. Equistar also sued Halliburton Company and Ingersoll–Rand Company, but they were dismissed by the trial court on motion for directed verdict. Equistar does not appeal either dismissal.

2. The compressors were originally manufactured by Dresser Clark (Dresser–Rand's predecessor) and sold to Arco Refineries (Equistar's predecessor). Arco later sold the plant to Lyondell Petrochemical Company, who sold it to Equistar. Upon purchase, Equistar acquired all contractual rights and obligations relating to the plant's operations. As no issue turns on these changes, we make no distinction among the parties and their privies herein.

3. Resonance, in this context, refers to the tendency of rotating equipment to vibrate at a particular frequency. It is a well-known potential hazard for such equipment.

welds.[4] However, the reduction in size required an increase in operating speed in order to maintain production levels. On April 1, 1999, one of the impellers failed again. The unit was returned to service May 1 with a newly installed impeller, but two weeks later that one failed as well.

Equistar filed suit in 2000, seeking more than $40 million for extensive damage to one of the compressors and consequential damages from the interruption of production. This suit involves only the 1999 failures—apparently Equistar's predecessor filed no claims regarding the earlier ones.

### Limitations and the Economic Loss Rule

Dresser contends all Equistar's claims are barred as a matter of law by statutes of limitation and repose. The latter,[5] though pleaded, was apparently never raised by any motion in the trial court; we agree with Equistar that raising it for the first time on appeal was too late.[6] But the former—limitations—was asserted by un-

successful motions both before and after trial.

■ The accrual of a cause of action, and hence the running of the statute, is a matter of law for the court.[7] The statute of limitations for Equistar's tort claims (product-liability actions asserting both negligence and strict liability) is two years from the date of injury.[8] By contrast, the statute of limitations for Equistar's contract claim (breach of an implied warranty of fitness) is four years from the date of sale, regardless of when the buyer learned of the breach.[9] Thus, we must first decide whether this is a tort or contract claim before we can decide whether either has run.[10]

■ Equistar obtained favorable verdicts on both tort and warranty theories, but Texas law does not allow it the option of pursuing both in these circumstances. By adopting the economic loss rule in 1977, the Supreme Court of Texas drew a bright line between warranty and product-

---

**4.** Sermatech coating was applied to resist corrosion, and "shot-peening," a welding enhancement technique, was used to create stronger welds.

**5.** See TEX. CIV. PRAC. & REM.CODE § 16.012 (providing 15–year statute of repose for equipment manufacturers).

**6.** See TEX.R.APP. P. 33.1(a) (requiring timely and sufficiently specific request, objection, or motion to preserve complaint for appellate review).

**7.** See Holy Cross Church of God in Christ v. Wolf, 44 S.W.3d 562, 567 (Tex.2001).

**8.** See TEX. CIV. PRAC. & REM.CODE § 16.003(a); Seibert v. Gen. Motors Corp., 853 S.W.2d 773, 776–77 (Tex.App.-Houston [14th Dist.] 1993, no pet.). Equistar does not assert that either of the 1999 failures was undiscoverable.

**9.** See TEX. BUS. & COM.CODE § 2.725(b); Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 435 (Tex.1997).

**10.** Though Dresser's pre- and post-trial motions did not explicitly mention the economic loss rule, they necessarily encompassed it—if no tort claims could be asserted, then the cause of action accrued on the date of sale and Equistar's suit was untimely. Additionally, Dresser's no-evidence point in its directed verdict and post-trial motions challenging the tort awards preserved its contention that it had no duty in tort arising under the facts of this case. See Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist., 987 S.W.2d 50, 52 (Tex.1998) (holding point asserting no evidence supported DTPA award preserved contention that no implied warranty arose under facts of case); Edward D. Jones & Co. v. Fletcher, 975 S.W.2d 539, 543 (Tex. 1998) (holding post-trial point asserting no evidence supported judgment preserved contention that defendant had no duty to ascertain client's mental capacity).

liability claims.[11] In transactions between commercial buyers and sellers, if damage occurs only to the product that passed between them, the claim is one for economic loss and must be brought on the parties' contract; conversely, if there is physical injury to persons or "other property" (that is, property other than the product itself), those claims may be brought in tort.[12]

For example, in *Murray v. Ford Motor Company*,[13] an electrical failure in the Murrays' truck destroyed both the truck (worth $9,500) and personal property stored in it (worth $453).[14] The Fifth Court of Appeals held all damages to the truck (the "product" Ford sold to the Murrays) had to be brought as warranty claims, which the Murrays had abandoned as the fire occurred more than four years after purchase.[15] The Court remanded the Murrays' claims for damage to their personal property (the "other property") as they were properly brought as tort claims within two years after the fire.[16]

Federal maritime law also follows the economic loss rule, and to the same effect. In *Saratoga Fishing Co. v. J.M. Martinac & Co.*,[17] defective hydraulics allegedly caused a fire that sank a fishing vessel, taking down with it assorted nets, skiffs, and spare parts, but with no loss of life.[18] The United States Supreme Court held the economic loss rule barred recovery in tort

for any damages related to the fishing vessel itself, but did not bar a tort claim regarding the assorted equipment added after the boat was bought.[19]

As discussed in more detail below, almost all of the damages claimed by Equistar in this case stem from damage to the compressors themselves. Assuming the compressors themselves are the product, any claim for damage to them had to be brought in a contract or warranty action by 1979 (four years after the original sale).

### Component Parts

■ But Equistar argues we should consider only the impellers as the "product," and consider the compressors themselves as "other property" for which damages are recoverable in tort. Based again on precedent from the highest authority, we disagree.

In *East River Steamship Corporation v. Transamerica Delaval, Inc.*,[20] the United States Supreme Court held that when a defective turbine component damaged the rest of the turbine, it had not damaged "other property":

> Since each turbine was supplied by Delaval as an integrated package, each is properly regarded as a single unit. Since all but the very simplest of machines have component parts, a contrary holding would require a finding of "prop-

---

11. See *Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 80 (Tex.1977).

12. See *id.*; *Mid Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.*, 572 S.W.2d 308, 312–13 (Tex.1978) (holding economic loss rule barred strict liability claim); *Indelco, Inc. v. Hanson Indus. N. Am.—Grove Worldwide*, 967 S.W.2d 931, 933 (Tex.App.-Houston [14th Dist.] 1998, pet. denied) (holding economic loss rule barred negligence claim).

13. 97 S.W.3d 888 (Tex.App.-Dallas 2003, no pet. h.).

14. *Id.* at 890.

15. *Id.* at 891–92.

16. *Id.* at 893.

17. 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997).

18. *Id.* at 877–78, 117 S.Ct. at 1785.

19. *Id.* at 884–85, 117 S.Ct. at 1789.

20. 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

erty damage" in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability.... Obviously, damage to a product itself has certain attributes of a products-liability claim. But the injury suffered—the failure of the product to function properly—is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain.... Damage to a product itself is most naturally understood as a warranty claim.[21]

Similarly, the Supreme Court of Texas has held that damage to an entire airplane caused by the failure of one component could not be brought in tort because of the economic loss rule.[22] Accordingly, damage to the compressors caused by impellers (at least, the original ones) was not damage to "other property," and thus again had to be brought as a contract or warranty action by 1979.

### Replacement Parts

■ But Equistar points out the impellers that failed in 1999 were not the original components but replacements. In the decades after the initial sale, impellers were occasionally modified or replaced; the two that failed in 1999 were sold by Dresser as replacements in 1988 and 1991.[23] Because they were not a part of the original sale, Equistar argues the replacement impellers must be considered a

separate product from the compressors. Texas courts do not appear to have addressed the economic loss rule in the context of replacement parts, but other courts generally have not made any such distinction.

For example, in *East River*, some of the turbine components that damaged the maritime turbines were replacement parts, sold by the same manufacturer and containing the same defect.[24] In holding that damages to the turbines could not be brought in tort, the United States Supreme Court made no distinction between damage caused by the original and the replacement components.[25]

The issue was addressed in more detail recently by the Third Circuit. That court held a defective connecting rod that damaged an entire engine had not damaged "other property" (thus barring any tort claim), even though it was installed as a replacement part 10 years after the original sale:

> Sea–Land has not convinced us, however, that there is any rational reason to deviate from the integrated product rule simply because the defective component happens to be a replacement part instead of the part originally supplied with the product.... Since all commercial parties are aware that replacement parts will be necessary, the integrated product should encompass those replacement parts when they are installed in

---

**21.** *Id.* at 867–68, 872, 106 S.Ct. at 2300, 2302 (quoting in part *N. Power & Eng'g Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 330 (Alaska 1981)).

**22.** *See Mid Continent*, 572 S.W.2d at 310–11, 313. Similarly, in *Signal Oil & Gas Co. v. Universal Oil Products*, the Supreme Court of Texas held that damage to a reactor because of defective bolts would not have been damage to "other property" but for additional damage that was also done *"to other sur-*

*rounding property."* 572 S.W.2d 320, 325 (Tex.1978) (emphasis in original).

**23.** The impeller that failed in April 1999 was sold to Equistar's predecessor in 1991; the impeller that failed in May 1999 was sold in 1988 or before.

**24.** *See* 476 U.S. at 860, 106 S.Ct. at 2296–97.

**25.** *See id.* at 874–768, 106 S.Ct. at 2304.

the engine. [citation omitted.] Sea–Land would, however, have us believe that the difference in timing is dispositive ... [and that] the later addition of replacement parts is a new *product.* We disagree. It is a common commercial practice for the parties to a transaction to contemplate the integration of replacement parts subsequent to a purchase. In the instant case, it was expected that all the replacement parts would eventually have to be integrated into the engine. The GE connecting rod was purchased to be installed and to become integrated with the GE engine. It is a component of that engine; it has no use to Sea–Land otherwise.[26]

Although it is not unanimous, most courts have followed the same reasoning and held replacement parts provided by the original seller do not make the original product "other property." [27]

For four reasons, we think this application of the economic loss rule should be the same in Texas as in most other jurisdictions. First, the Supreme Court of Texas adopted the economic loss rule for the same reasons and after considering the same alternatives as the United State Supreme Court.[28] Applying the same rule differently would create more confusion in an area that already suffers from that difficulty.

Second, replacing one defective part with another is not a new injury. In this case, there is no evidence the replacement impellers were defective in a way that was different from the originals.[29] If Equistar's predecessor was deprived of the benefit of its bargain by getting defective impellers, that harm accrued upon the original purchase.

Third, applying a different rule would defeat the purpose for which Texas

---

**26.** *Sea–Land Serv., Inc. v. Gen. Elec. Co.,* 134 F.3d 149, 154 (3rd Cir.1998) (emphasis in original).

**27.** *See Petroleum Helicopters, Inc. v. Avco Corp.,* 930 F.2d 389 (5th Cir.1991) (holding damage to helicopter caused by defective flotation device fell within economic loss rule, even though device had been removed, overhauled, and reinstalled several times, and sank with different helicopter than one with which it had originally been sold); *Northland Power v. Gen. Elec., Co.,* 105 F.Supp.2d 775, 789–92 (S.D.Ohio 1999) (applying economic loss rule under California law, and holding damage to entire generator caused by refurbished and recoated engine blades fell within economic loss rule); *Exxon Shipping Co. v. Pac. Res., Inc.,* 835 F.Supp. 1195, 1201 (D.Haw.1993) (holding damage to mooring system caused by defective chain fell within economic loss rule even though it was sold as a spare and installed later as replacement). *But cf. Philippine Am. Life Ins. v. Raytheon Aircraft Co.,* 252 F.Supp.2d 1138, 1144 (D.Kan.2003) (refusing to hold as a matter of law that Kansas economic loss rule barred claims based on free replacement part that damaged airplane). Of course, a different

situation may be presented when a replacement part is purchased from someone other than the original seller. *See Transco Syndicate # 1, Ltd. v. Bollinger Shipyards, Inc.,* 1 F.Supp.2d 608, 612 (E.D.La.1998) (refusing to apply economic loss rule to refurbisher of engine who was not also seller of boat).

**28.** *Compare E. River,* 476 U.S. at 868–74, 106 S.Ct. at 2300–04, *with Mid Continent,* 572 S.W.2d at 310–13.

**29.** There was no evidence either impeller was more susceptible to corrosion or weld weaknesses than the originals; after coating and shot-peening in 1996, it was undisputed they were certainly less so. Neither was there evidence the replacement impellers were more susceptible to resonance than the originals—although Dresser recommended increasing the operating speeds in 1995 to maintain production levels, it never changed the maximum continuous operating speed it had originally certified. Thus, any injury from Dresser's approval of operating ranges within which resonance could occur accrued (like all Equistar's other claims) upon original delivery in 1975.

adopted the economic loss rule in the first place. The rule is based on the proposition that commercial parties may negotiate for whatever warranty or liability limits they choose, and adjust their price accordingly.[30] If replacement parts escape the reach of the economic loss rule, then tort law would create new and expanded liabilities long after any negotiated warranty had expired. Such a rule could make replacement parts very expensive (assuming sellers would supply them at all), as the price would have to reflect a new four-year extended warranty on the original product.

Finally, Texas law already provides that a seller's efforts to repair or replace defective parts does not extend the limitations period for breach of warranty claims.[31] If the economic loss rule does not apply to those same post-sale efforts, then parties can achieve the opposite result by simply pleading their claims in tort.

For all of these reasons, we follow the majority of jurisdictions in applying the economic loss rule to replacement components. Thus, all of Equistar's claims for damage to the compressors themselves had to be brought within four years of the original sale; because they were not, they are barred by limitations.[32]

### Nearby Parts

■ Almost all of the $3.6 million in damages Equistar proved at trial were for parts, technical assistance, and labor needed to repair the compressors themselves. For the reasons stated above, such claims were barred. All of the alleged $37 million in additional damages excluded by the trial court were for the same purpose,[33] so they too are barred and Equistar's cross-appeal is rendered moot.

But there was some testimony that equipment located near the compressors suffered minor damage in the 1999 failures. Such damages would be damage to "other property," and thus could be

---

**30.** *See E. River*, 476 U.S. at 873, 106 S.Ct. at 2303 (noting that law of warranty is well-suited to commercial controversies, as parties can set their own terms and adjust price accordingly).

**31.** *See Pako Corp. v. Thomas*, 855 S.W.2d 215, 219 (Tex.App.-Tyler 1993, no writ) (holding gear replacements and repair efforts did not extend warranty accrual date past original date of sale); *see also Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 364–65 (5th Cir. 1988) (surveying Texas law on this point).

**32.** Even if we are incorrect and a new warranty begins with the sale of every replacement part, we would still have to reverse the trial court's judgment. The only warranty Equistar submitted to the jury concerned the fitness of the products, a warranty applicable to sales rather than repairs. *See* Tex. Bus. & Com.Code § 2.314. It is unclear whether such a warranty would exist under these facts. *See Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.*, 987 S.W.2d 50, 53 (Tex. 1998) (barring any implied warranty for repair services if claimant could have brought negligence or contract actions). But assum-

ing it does, it would run from the sale of the replacement impellers by Dresser, the latest of which was nine years before suit was filed. As a substantial part of the judgment here related to damage to the impellers themselves, that portion would still be subject to the economic loss rule and thus barred by limitations.

**33.** The trial court excluded damages for lost profits, costs to replace product and feedstock, and costs to expedite repairs, based on the parties' 1998 general agreement to terms and conditions for all their dealings. These damages are all consequential damages from the loss of the compressor unit itself. *See E. River*, 476 U.S. 858, 873–74, 106 S.Ct. at 2303–04 (holding repair costs and lost profits due to damage to product itself must be recovered under warranty law); *Mid Continent*, 572 S.W.2d at 312–13 (holding loss of use and cost of repair due to damage to product itself must be recovered under warranty law). Thus, they are also barred by limitations pursuant to the economic loss rule.

brought as a tort claim under the economic loss rule.

Equistar argues this minor damage to "other property"—no matter how small—allows *all* its claims to be brought in tort. A sentence in a Texas Supreme Court case issued shortly after the economic loss rule was adopted might support this theory:

> To the extent that the product itself has become part of the accident risk or the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss.[34]

For several reasons, we agree with the *Murray* court's rejection of this construction.[35] First, the quoted case does not actually apply the theory; though suggesting damage to "other property" allowed the entire claim to be brought in tort, the only claim actually remanded was in warranty.[36] Second, a case issued the same day reaches the opposite conclusion.[37] Third, this construction would again defeat the purpose behind the economic loss rule—having adopted the Uniform Commercial Code's approach that commercial parties must bargain for any warranty they want, it would abandon that approach if there was a scratch to neighboring equipment, or if a single paper clip went down with the ship. We agree with the United States Supreme Court and the Dallas Court of Appeals that damage to the

product itself remains a warranty claim in *all* cases, and only damage to persons or other property may be brought in tort.[38]

There was no evidence at trial segregating the amount of damages to property other than the compressors themselves. Because there was evidence to support damage to other property, but nothing like the entire amount awarded, we must reverse and remand for a new trial on those claims.[39]

Dresser argues we need not remand these product-liability claims as there was no evidence to support liability under any of them. But there was evidence resonance could occur within the normal operating speeds Dresser approved, resulting in metal fatigue and eventual failure. Dresser argues Equistar's predecessors should have known of this risk from the earlier failures, but the evidence showed even the experts disagreed on what caused them. No discovery rule question was submitted to the jury, and we cannot say as a matter of law that Equistar should have known the recommended operating speeds were wrong. Accordingly, we must remand Equistar's tort claims to the extent they seek damage to property other than the compressors themselves.

### Conclusion

Both parties to this 1975 sale were huge companies, well able to protect themselves

**34.** *See Signal Oil,* 572 S.W.2d at 325.

**35.** *See Murray,* 97 S.W.3d at 892.

**36.** The strict-liability claim was barred because the jury failed to find it was a producing cause of the damages. *See Signal Oil,* 572 S.W.2d at 324–26.

**37.** *See Mid Continent,* 572 S.W.2d at 317 (Pope, J., dissenting) (noting in dissenting opinion joined by author of *Signal Oil* that Court's ruling limited plaintiff to contract action for damage to airplane itself, while allowing tort actions for damage to pilot, bystanders, and surrounding property).

**38.** *See Saratoga Fishing,* 520 U.S. at 879–85, 117 S.Ct. at 1786–89; *Murray,* 97 S.W.3d at 893.

**39.** *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 51 (Tex.1998) (holding new trial required when there is evidence to support some damages but not the entire amount awarded); *Texarkana Mem'l Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 841 (Tex.1997) (same).

in any contract they made. Both knew these very expensive machines were intended to operate under extreme conditions for many years, and a catastrophe might result if they did not. If Equistar and its predecessors wanted Dresser to pay for damage to the compressors occurring 24 years after installation, they should have negotiated a warranty to that effect. Such a warranty would no doubt have been expensive. But having chosen not to incur that expense, the owners of this equipment cannot claim the benefit of a bargain they chose not to make.

We reverse the trial court's judgment, render a take-nothing judgment on Equistar's claims stemming from damage to the compressors themselves, and remand Equistar's tort claims stemming from damage to property other than those compressors.