# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 8, 2020

Lyle W. Cayce
Clerk

No. 19-10238

GOLDEN SPREAD ELECTRIC COOPERATIVE, INCORPORATED,

      Plaintiff - Appellant

WESTPORT INSURANCE COMPANY, as subrogee of Golden Spread
Electric Cooperative, Incorporated,

      Intervenor - Appellant

v.

EMERSON PROCESS MANAGEMENT POWER & WATER SOLUTIONS,
INCORPORATED,

      Defendant - Appellee

Appeal from the United States District Court for the
Northern District of Texas

Before WIENER, HIGGINSON, and HO, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Golden Spread Electric Cooperative, Inc. ("Golden Spread") and Intervenor-Appellant Westport Insurance Company ("Westport") appeal the dismissal of their tort claims against Defendant-Appellee Emerson Process Management Power & Water Solutions, Inc. ("Emerson"). Golden Spread and Westport (collectively, "Appellants") contend that the district court

No. 19-10238

erred in applying Texas's economic loss rule to bar tort remedies for damage to a turbine generator. For the reasons discussed below, we AFFIRM.

## I.    BACKGROUND

The parties do not dispute the facts in this case. Golden Spread is a public utility. It operates a power generation facility in Texas that employs several turbine generators, including an Alstom steam turbine generator known as Unit 3. That generator was purchased from Alstom and installed from 1999 to 2000. Emerson played no part in the design, sale, or installation of Unit 3 or its original control system.

In 2013, Golden Spread asked Emerson to make a proposal for upgrading Unit 3's control system. As described by Emerson,

> The control system includes computer hardware, software[,] and associated equipment, and is the control interface for all engagement and control functions of the steam turbine to include, but not limited to[:] an interface to field instrumentation, complete control of system devices, startup and shutdown sequencing, [and] adjusting system settings and inputs/outputs that the turbine converts into energy. The control system is also the necessary means for operation and control of the steam turbine's integrated subsystems.

Emerson visited the power generation facility to gather information and made a proposal to Golden Spread in early 2014 for the provision of a new, customized control system. Emerson did not simply offer to supply a part. Its letter proposed to provide Golden Spread with "detailed project engineering, control strategy implementation, system testing, system start-up[,] and ongoing support" for the upgrade effort. The parties completed their contract in March 2014 after specifically negotiating over liability issues.

Emerson installed the new control system pursuant to the contract. In March 2015 during testing and commissioning of the new control system, Unit 3 suffered a power failure. As the turbine coasted to a stop, the control system failed to maintain the flow of oil lubricant, causing the turbine to overheat and

2

No. 19-10238

suffer damage. The control system's software had been programmed incorrectly; it issued a stop command to a specific lubricant pump while the turbine was spinning and while no other source of lubricant was available. Golden Spread made a warranty claim to Emerson, which Emerson satisfied by modifying the control system software. Golden Spread returned Unit 3 to service and obtained nearly $8 million from its insurance.

Golden Spread sued Emerson in state court for breach of contract, negligence, and products liability, seeking more than $8 million in damages. Emerson removed the case to federal court on the basis of diversity jurisdiction. Intervenor-Appellant Westport Insurance Company intervened as subrogee of Golden Spread. The district court adopted the magistrate judge's recommendations, granting summary judgment for Emerson and dismissing all claims against it. The court dismissed Appellants' contract claims because Golden Spread had not revoked acceptance of the contract, and because Emerson satisfied its sole duty under the contract, viz., to remedy the defective software. The district court dismissed Appellants' tort claims (negligence and products liability) as barred by the economic loss rule.

Appellants now appeal only the district court's ruling as to their tort claims. They contend that, under Texas law, the damage to Unit 3 was damage to other property not covered by the economic loss rule.

## II.    STANDARD OF REVIEW

The facts are not in dispute, so we review de novo the district court's grant of summary judgment "to determine whether it was rendered according to law." *United States v. Jesco Const. Corp.*, 528 F.3d 372, 374 (5th Cir. 2008). Whether the economic loss rule bars Appellants' tort claims is a question of law. *See McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 474 (5th Cir. 2015); *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 268 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd).

No. 19-10238

### III.  ANALYSIS

"When adjudicating a claim for which state law provides the rule of decision, federal courts are bound to apply the law as interpreted by the state's highest court. . . ." *Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 317 (5th Cir. 2002). When, as is the case here, the state's highest court has not spoken to a particular issue, we must make an *Erie* guess to "determine, in our best judgment, how we believe that court would resolve [it]." *84 Lumber Co. v. Cont'l Cas. Co.*, 914 F.3d 329, 333 (5th Cir. 2019) (quoting *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 607 (5th Cir. 2014)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77–80 (1938). "In making an *Erie* guess, we defer to intermediate state appellate court decisions, 'unless convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008) (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002)).

Under Texas law, the economic loss rule generally prevents recovery in tort for purely economic damage unaccompanied by injury to persons or property. *See LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 235 (Tex. 2014); *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011); *see also Am. Eagle Ins. Co. v. United Techs. Corp.*, 48 F.3d 142, 144 (5th Cir.), *on reh'g*, 51 F.3d 468 (5th Cir. 1995). There are two principal rationales for the rule: (1) Purely economic harms proliferate widely and are not self-limiting in the way that physical damage is, possibly leading to indeterminate liability and pressure to avoid economic activity altogether; and (2) the risks of economic harms are better suited to allocation by contract because (a) the parties usually have a full opportunity to consider their positions and manage risks ahead of time, and (b) pecuniary remedies are fungible. *LAN/STV*, 435 S.W.3d at 240–41 (quoting RESTATEMENT (THIRD) OF

No. 19-10238

TORTS: LIABILITY FOR ECONOMIC HARM § 1 cmt. c (AM. LAW INST., Tentative Draft No. 1, 2012)). "The rule is based on the proposition that commercial parties may negotiate for whatever warranty or liability limits they choose, and adjust their price accordingly." *Equistar Chems., L.P. v. Dresser-Rand Co.*, 123 S.W.3d 584, 590 (Tex. App.—Houston [14th Dist.] 2003), *rev'd on other grounds*, 240 S.W.3d 864 (Tex. 2007). Thus, the economic loss rule also serves to enforce the boundary between tort and contract, encouraging parties to contract ahead of time how to allocate risks, and to ensure that those allocations will not be undone later by the application of tort law. *See LAN/STV*, 435 S.W.3d at 240; RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 3 cmt. b. "In operation, the rule restricts contracting parties to contractual remedies for those economic losses associated with the relationship, even when the breach might reasonably be viewed as a consequence of a contracting party's negligence." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12–13 (Tex. 2007).

The Texas Supreme Court directs that "the application of the [economic loss] rule depends on an analysis of its rationales in a particular situation." *LAN/STV*, 435 S.W.3d at 245–46. Still, we need not start entirely from scratch. When a defect in a product deprives a buyer of profits, those are purely economic damages recoverable only in contract. *Hininger v. Case Corp.*, 23 F.3d 124, 126 (5th Cir. 1994) (denying recovery in tort of profits lost when tractor wheels broke). Physical damage is generally recoverable in tort, but a defective product causing damage to itself is not enough—the economic loss rule still limits recovery for such damage to contract. *See LAN/STV*, 435 S.W.3d at 241, n.33; *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007). This is because "damage to the product itself is essentially a loss to the purchaser of the benefit of the bargain with the seller," recoverable in contract rather than tort. *Mid Continent Aircraft Corp. v. Curry Cty. Spraying Serv.,*

*Inc.*, 572 S.W.2d 308, 313 (Tex. 1978). If, however, the defective product damages other property, the economic loss rule does not bar recovery in tort for those damages. *See Signal Oil & Gas Co. v. Universal Oil Prod.*, 572 S.W.2d 320, 325 (Tex. 1978) (allowing recovery in tort when a reactor heater exploded and damaged "other property in the area").

If a product was purchased as a complete whole, damage to that product caused by one of its component parts is considered damage to the product itself—rather than damage to other property—and limited to recovery in contract by the economic loss rule. *See Mid Continent Aircraft Corp.*, 572 S.W.2d at 310, 313 (holding that damage to an aircraft's wings and fuselage on emergency landing forced by a defective engine was limited by the economic loss rule); *Arkwright-Bos. Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1175–76, 1177–78 (5th Cir. 1988) (holding that economic loss rule barred recovery in tort for damage to a turbine caused by a defective blade that suddenly broke). The self-damage rule applies both when a component part breaks and prevents the product from functioning properly, *see, e.g.*, *Hininger*, 23 F.3d at 125, 127 (tractor wheels leaked air and cracked, causing down-time), and when the component part's failure causes physical damage to a different component part, *see, e.g.*, *Mid Continent Aircraft Corp.*, 572 S.W.2d at 310–11, 313. And it applies even when the defective component part was manufactured by an entity other than the entity that assembled the final product. *See Hininger*, 23 F.3d at 126–27 (holding that purchaser of tractor could not recover in tort from company that supplied defective tires to the entity that incorporated them into the finished tractor and sold it to purchaser).

Those rules guided this court in *American Eagle Insurance Co. v. United Technologies Corp.*, 48 F.3d 142, 144–45 (5th Cir.), *on reh'g*, 51 F.3d 468 (5th Cir. 1995), when we held that, under Texas law, damage to the hull of an aircraft caused by a defective engine was covered by the economic loss rule and

No. 19-10238

therefore not recoverable in tort. Plaintiff had purchased the aircraft as a finished product, complete with hull and engines already joined. *Id.* This court reasoned that, rather than the engine being the defective product that damaged the hull, the "entire aircraft was the defective product" that damaged itself, just as in *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308 (Tex. 1978). *See Am. Eagle Ins. Co.*, 48 F.3d at 144–45. We found it particularly compelling that there was no evidence that the buyer had bargained for the engine separately from the aircraft. *See id.*

Such a lack of separate bargaining can inform the determination of whether a product has damaged other property, rather than itself, but the presence of separate bargaining alone is not necessarily determinative. Replacement parts, for example, are often purchased separately from the original product. The Texas Supreme Court has not considered whether damage to a product caused by defective replacement parts is damage to other property, but both of the two Texas intermediate courts to do so have held that the economic loss rule applies, at least when the replacement parts come from the manufacturer of the original product.

In *Grizzly Mountain Aviation, Inc. v. Honeywell International, Inc.*, No. 13-11-00676-CV, 2013 WL 5676069, at *1 (Tex. App.—Corpus Christi Oct. 17, 2013, no pet.) (mem. op.), the plaintiff separately purchased two complete helicopters from the seller, both of which were equipped with engines manufactured by the defendant. The plaintiff later transferred an engine from one helicopter to the other, which then crashed because the engine failed. *Id.* The plaintiff argued that the economic loss rule did not apply because the component part that damaged the helicopter was bargained for separately from the airframe. *Id.* at *5. The state appellate court rejected that analysis and held that moving an identical engine from one helicopter to another did not make the receiving helicopter "other property." *Id.* at *8.

7

No. 19-10238

In *Equistar Chemicals, L.P. v. Dresser-Rand Co.*, 123 S.W.3d 584, 585 (Tex. App.—Houston [14th Dist.] 2003), *rev'd on other grounds*, 240 S.W.3d 864 (Tex. 2007), the plaintiff purchased gas compressors from the defendant in 1975 to use in its chemical plant.[1] The compressor impellers failed twice in 1999, causing damage to a compressor and lost profits. *Id.* at 586. Those impellers had been purchased from the defendant as replacements in 1988 and 1991. *Id.* at 588. The court held that, even though the impellers that failed were purchased separately from the compressor that they damaged, the compressor was not "other property" so the economic loss rule applied. *Id.* at 588–90. Among other justifications, the court looked to the rationale of the economic loss rule. *Id.* at 589–90. It reasoned that allowing recovery in tort in such situations could make replacement parts too expensive and that the risk was thus better allocated by contract. *Id.* at 590.

One Texas intermediate court and several federal district courts applying Texas law have gone a step further, applying the economic loss rule when, in the hands of a commercial firm assembling its own finished product, the failure of a component part purchased from one supplier physically damages another component part not purchased from that supplier. In *Lopez v. Huron*, 490 S.W.3d 517, 519 (Tex. App.—San Antonio 2016, no pet.), the plaintiff manufactured masa and purchased plastic bags from the defendant in which to package it. The bags split, forcing the plaintiff to take customer returns and causing the masa to spoil. *Id.* The court held that the damage to the masa itself was not damage to other property exempt from the economic loss rule because "the claim [was] for damage to a finished product caused by

---

[1] The Texas Supreme Court reversed on the issue of whether defendant had preserved error regarding the economic loss rule, but "express[ed] no opinion on that part of the court of appeals' opinion which addresse[d] the rule and its application." *Equistar Chems., L.P.*, 240 S.W.3d at 868–89, n.2.

a defective component." *Id.* at 524. The court reasoned that the damage could have been "reasonably contemplated" by the parties. *Id. See also TEU Servs., Inc. v. Inventronics USA, Inc.*, No. SA-16-CV-01023-RCL, 2018 WL 3338217, at \*5 (W.D. Tex. Feb. 5, 2018) (applying economic loss rule to damage suffered to other components in an LED fixture caused by a faulty driver purchased separately because the damage was to an "integrated, finished product"); *Sanitarios Lamosa, S.A. de C.V. v. DBHL, Inc.*, No. CIV.A. H-04-2973, 2005 WL 2405923, at \*6 (S.D. Tex. Sept. 29, 2005) (applying economic loss rule to damage suffered by toilet tanks in which plaintiff had installed defective ballcocks purchased from a supplier, because the toilet was the "completed product"); *Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp. 2d 482, 488, 504–05 (N.D. Tex. 2001) (applying economic loss rule to aluminum shells damaged by the separately purchased structural foam that plaintiff had sprayed into them to form architectural panels, because the damage was foreseeable and therefore addressable in contract, and because the nature of the defect was more like the failure to meet expectations, an issue of contract, than a dangerous condition, an issue of tort).

Here, a commercial firm purchased a faulty component part to integrate it with other components with the intent to use, not to resell, the finished unit. In considering whether to apply the economic loss rule, we do not believe that the Texas Supreme Court would apply a strict separately-bargained-for test, but rather would analyze the rule's "rationales in [the] particular situation" to determine whether the risk suffered is better addressed in tort or in contract. *LAN/STV*, 435 S.W.3d at 245–46. We conclude that the economic loss rule applies.

First, the object of the bargain here, or the subject of the contract, was an upgraded, more efficient steam turbine generator. The physical control system itself is a component part of the functioning generator. It has no

purpose apart from the turbine, and the turbine will not work without a control system of some kind. In that way, the integrated Unit 3 is like the many products damaged by component parts that have been covered by the economic loss rule in Texas. Golden Spread purchased the control system from a different entity than the turbine and in a separate transaction, which weighs against applying the economic loss rule. But Golden Spread's purchase of the control system was more than just obtaining a replacement part. Emerson offered to "target and analyze conditions" in Golden Spread's plant to "determin[e] optimal operating conditions and offer[] tremendous cost savings." In order to accomplish that, Emerson provided "detailed project engineering, control strategy implementation, system testing, system start-up[,] and ongoing support." Rather than the simple purchase of a physical part, Golden Spread sought, and Emerson provided, the means to achieve an upgraded version of a complex machine, the whole turbine. *Cf. Lopez*, 490 S.W.3d at 524 (analyzing finished product of masa-in-bag, not the bags alone).

Second, the problem that caused the damage to the turbine is more akin to a failure to meet contractual expectations than a dangerous defect redressable in tort. The control system did not catch fire and damage the turbine; rather, it sent the wrong commands. Improving the commands sent to the turbine was the very purpose of the upgrade contract. *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) ("[T]he source of the duty and the nature of the wrong should be examined to determine whether the underlying claim is in tort or contract.").

Together, these reasons also make the damage suffered foreseeable to the parties. As they were contemplating the details of the operation of the integrated turbine and control system to improve its efficiency, it was eminently foreseeable that the control system might send the wrong commands.

No. 19-10238

For those reasons, we believe that the Texas Supreme Court would conclude that the risk suffered here is better addressed in contract than in tort. The parties are sophisticated, commercial actors that actually did negotiate over the allocation of risk.[2] It is well-established that, under Texas law, a party cannot recover from a seller in tort for damage to the product itself. The facts in this case present a much closer issue, but the parties themselves were in the best position to understand and allocate the risks of their transaction ahead of time to resolve any ambiguities in the application of that rule to their circumstances. As the Texas Supreme Court reasoned, "we think the availability of contractual remedies must preclude tort recovery in the situation generally because . . . 'clarity allows parties to do business on a surer footing.'" *LAN/STV*, 435 S.W.3d at 248 (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 6 cmt. c (AM. LAW INST., Tentative Draft No. 2, 2014)) (holding that the economic loss rule bars a contractor from suing for negligent designs the owner's architect with whom the contractor was not in privity).

The judgment of the district court is AFFIRMED.

---

[2] Although Appellants argue otherwise, the inclusion of an overall cap on liability does not speak to what may trigger that liability.