# IN THE SUPREME COURT OF TEXAS

════════════
No. 11-0810
════════════

LAN/STV, A JOINT VENTURE OF LOCKWOOD, ANDREWS & NEWMAN, INC.
AND STV INCORPORATED, PETITIONER,

v.

MARTIN K. EBY CONSTRUCTION COMPANY, INC., RESPONDENT

════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS
════════════════════════════════════════════════════════

**Argued October 8, 2013**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

In actions for unintentional torts, the common law has long restricted recovery of purely economic damages unaccompanied by injury to the plaintiff or his property[1] — a doctrine we have referred to as the economic loss rule.[2] The rule serves to provide a more definite limitation on liability than foreseeability can and reflects a preference for allocating some economic risks by

---

[1] *See, e.g.*, Fleming James, Jr., *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal*, 25 VAND. L. REV. 43, 43 (1972) ("Under the prevailing rule in America, a plaintiff may not recover for his economic loss resulting from bodily harm to another or from physical damage to property in which he has no proprietary interest.").

[2] *See, e.g.*, *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011) ("[P]arties may be barred from recovering in negligence or strict liability for purely economic losses. This is often referred to as 'the economic loss rule.'" (citations omitted)).

contract rather than by law.[3]  But the rule is not generally applicable in every situation; it allows recovery of economic damages in tort, or not, according to its underlying principles.[4]  The issue in this case is whether the rule permits a general contractor to recover the increased costs of performing its construction contract with the owner in a tort action against the project architect for negligent misrepresentations — errors — in the plans and specifications.  We conclude that the economic loss rule does not allow recovery and accordingly reverse the judgment of the court of appeals[5] and render judgment for the architect.

---

[3] *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 1 cmt. c (Tentative Draft No. 1, 2012) ("RESTATEMENT, T.D. 1").  Sections 1 through 5 of this draft were approved by the membership of the American Law Institute at the 2012 Annual Meeting, subject to the discussion at the Meeting and to editorial prerogative. Proceedings at 89th Annual Meeting: American Law Institute, 89 A.L.I. Proc. 46-47 (2012).  According to the Institute: "Once it is approved by the membership at an Annual Meeting, a Tentative Draft or a Proposed Final Draft represents the most current statement of the American Law Institute's position on the subject and may be cited in opinions or briefs . . . until the official text is published." *Overview, Project Development*, AMERICAN LAW INSTITUTE, http://www.ali.org/-index.cfm?fuseaction=projects.main (last visited June 18, 2014).  A second draft, RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM (Tentative Draft No. 2, 2014) ("RESTATEMENT, T.D. 2"), was approved at the 2014 Annual Meeting.  Proceedings at 91st Annual Meeting: American Law Institute, 91 A.L.I. Proc. ___ (2014); *see also Actions Taken at the 91st Annual Meeting,* ALI'S 91ST ANNUAL MEETING, http://2014annualmeeting.org/actions-taken/ (last visited June 18, 2014).  Tentative Draft No. 2 covers the last three sections bearing on the unintentional infliction of economic loss, sections 6 through 8, and seven sections on the law of fraudulent misrepresentation; as the Reporter notes, section 6, on "Negligent Performance of Services", refers to and "is complementary to" section 5, on "Negligent Misrepresentation".  RESTATEMENT, T.D. 2, Reporter's Memorandum, at xvii.

[4] *Sharyland*, 354 S.W.3d at 415 ("'[T]here is not one economic loss rule broadly applicable throughout the field of torts, but rather several more limited rules that govern recovery of economic losses in selected areas of the law.'") (quoting Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 WASH. & LEE L. REV. 523, 534–535 (2009)); *see* RESTATEMENT, T.D. 1, § 1 cmt. b ("[D]uties of care with respect to economic loss are not general in character; they are recognized in specific circumstances according to the principles stated in Comment *c*.").  Another scholar also thought there was no single "economic loss rule" but instead a "constellation of somewhat similar doctrines that tend to limit liability" that seemed to work in different ways in different contexts, for not necessarily identical reasons, "with exceptions where the reasons for limiting liability were absent." Oscar S. Gray, *Some Thoughts on "The Economic Loss Rule" and Apportionment*, 48 ARIZ. L. REV. 897, 898 (2006) ("The core concept of this constellation, not quite a 'rule', seems to me to be an inhibition against liability in negligence for economic harm not resulting from bodily injury to the claimant or physical damage to property in which the claimant has a proprietary interest.") (footnotes omitted).

[5] 350 S.W.3d 675 (Tex. App.—Dallas 2011).

**I**

The Dallas Area Rapid Transportation Authority ("DART") contracted with LAN/STV to prepare plans, drawings, and specifications for the construction of a light rail transit line from Dallas's downtown West End to the American Airlines Center about a mile away. LAN/STV agreed to "be responsible for the professional quality, technical accuracy, and . . . coordination of all designs, drawings, specifications, and other services furnished", and to be "liable to the Authority . . . for all damages to the Authority caused by [LAN/STV's] negligent performance of any of the services furnished". DART incorporated LAN/STV's plans into a solicitation for competitive bids to construct the project. Martin K. Eby Construction Company, which had built two other DART light rail projects, one of which was designed by LAN/STV, submitted the low bid on this project, just under $25 million, and was awarded the contract. The contract provided an administrative procedure for Eby to assert contract disputes with DART, including complaints about design problems. Eby and LAN/STV had no contract with each other. Thus, LAN/STV was contractually responsible to DART for the accuracy of the plans, as was DART to Eby, but LAN/STV owed Eby no contractual obligation.[6]

Days after beginning construction, Eby discovered that LAN/STV's plans were full of errors — about bridge structures, manhole and utility line locations, subsurface soil conditions, an existing retaining wall, and many other aspects of the proposed construction. While Eby expected that, as on any project, 10% of the plans would be changed, it found that 80% of LAN/STV's drawings had

---

[6] Eby does not contend that it was a third-party beneficiary of the LAN/STV–DART contract.

3

to be changed. This disrupted Eby's construction schedule and required additional labor and materials. In all, Eby now calculates it lost nearly $14 million on the project.

Only seven months into what would turn out to be a 25-month job, Eby sued DART for breach of contract in the United States District Court.[7] The court dismissed the case because Eby had not exhausted its administrative remedies against DART under their contract and Texas law.[8] Eby then invoked DART's contract dispute procedures, claiming $21 million. The hearing officer not only rejected Eby's claim in its entirety, he concluded that DART was entitled to $2.4 million in liquidated damages from Eby. Eby filed an administrative appeal, but, before it was resolved, settled with DART for $4.7 million.

Meanwhile, Eby filed this tort suit against LAN/STV, asserting causes of action for negligence and negligent misrepresentation. After Eby and DART settled, this case proceeded to

---

[7] Eby alleged:

> In providing voluminous and detailed plans and specifications for Eby's use in preparing a bid price for this competitive bid project, DART was obliged to provide accurate and adequate information which could be reasonably relied upon for developing a competitive bid price. The information provided by DART, and upon which Eby relied, was in fact materially inaccurate and inadequate for performing the work resulting in extraordinary excess costs for performance and denying Eby the ability to perform the work in a productive and profitable fashion.

> *    *    *

> DART's failure, through LAN/STV, to provide Eby with adequate and accurate plans and specifications upon which to bid and perform this project, together with the lack of direction and cooperation in resolving the problems encountered due to these inadequacies and refusal to compensate Eby for these inadequacies, constitutes a material breach of contract . . . .

Eby also asserted a claim for misrepresentation, which was determined on appeal to be "just a subset of its breach-of-contract claim." *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 472 (5th Cir. 2004).

[8] The dismissal was affirmed on appeal. *Id*. at 465.

trial,[9] but only on Eby's claim that LAN/STV negligently misrepresented the work to be done in its error-ridden plans.[10] The jury agreed and assessed Eby's damages for its losses on the project at $5 million, but they also found that the damages were caused by Eby's and DART's negligence as well, and apportioned responsibility 45% to LAN/STV, 40% to DART, and 15% to Eby. The trial court concluded that Eby's $4.7 million settlement with DART should not be credited against the damages found by the jury, but that LAN/STV should be liable only for its apportioned share of the damages. Accordingly, the trial court rendered judgment for Eby for $2.25 million plus interest.

Both LAN/STV and Eby appealed, and following the court of appeals' affirmance,[11] both petitioned for review. We granted both petitions,[12] but as we view the case, we need only address LAN/STV's argument that Eby's recovery for negligent misrepresentation is barred by the economic loss rule.[13] We begin by surveying the development of the rule in American law and its status in Texas. We then turn to its application in this case.

---

[9] The trial court initially granted LAN/STV summary judgment on its claim of derivative immunity under TEX. TRANSP. CODE § 452.056(d), but the court of appeals reversed. *Martin K. Eby Constr. Co. v. LAN/STV*, 205 S.W.3d 16, 21 (Tex. App.—Dallas 2006, pet. denied).

[10] Eby alleged: "In the course of providing the referenced plans, drawings and specifications, LAN/STV made representations, in a transaction for which it was compensated, where those representations were false, misleading and/or inaccurate and were made with the knowledge that contractors such as Eby would rely upon them."

[11] 350 S.W.3d 675 (Tex. App.—Dallas 2011).

[12] 56 Tex. Sup. Ct. J. 277 (Feb. 15, 2013).

[13] LAN/STV and Eby each complain of the damage award: LAN/STV contends that it is entitled to a credit for Eby's $4.7 million settlement with DART, and Eby argues that the damages found by the jury should not have been reduced by the percentage of responsibility apportioned to DART. LAN/STV also argues that Eby's claim is barred by derivative immunity, that Eby's measure of damages is improper, and that Eby failed to prove all the elements of its negligent misrepresentation claim.

## II

### A

The law has long limited the recovery of purely economic damages in an action for negligence. An early example, oft-cited, is Justice Holmes's opinion in *Robins Dry Dock & Repair Co. v. Flint*,[14] a suit by the charterers of a steamship against a dry dock for damages for loss of the use of the vessel from a delay in repairs due to the dry dock's negligence. The Supreme Court held that the charterers could not recover their economic damages from the dry dock, either as third-party beneficiaries of the contract between the owners and the dry dock,[15] or for the dry dock's negligence. Justice Holmes explained:

> Of course the contract of the [dry dock] with the owners imposed no immediate obligation upon the [dry dock] to third persons [the charterers] as we already have said, and whether the [dry dock] performed it promptly or with negligent delay was the business of the owners and of nobody else. . . . [The charterers'] loss arose only through their contract with the owners . . . . [N]o authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. . . . The law does not spread its protection so far.[16]

Nearly sixty years later, Judge Higginbotham observed in *State of Louisiana v. M/V Testbank* that "*Robins* broke no new ground . . . . [T]he prevailing rule [in the United States and England] denied a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which

---

[14] 275 U.S. 303 (1927).

[15] *Id.* at 307-308.

[16] *Id.* at 308-309 (citations omitted).

he had no proprietary interest."[17]  Judge Higginbotham cited Professor James's 1972 article,

*Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal*:

> Under the prevailing rule in America, a plaintiff may not recover for his economic loss resulting from bodily harm to another or from physical damage to property in which he has no proprietary interest.  Similarly, a plaintiff may not recover for economic loss caused by his reliance on a negligent misrepresentation that was not made directly to him or specifically on his behalf.[18]

"The reasons for this difference in treatment of indirect economic loss and physical damage," Professor James continued, "do not derive from the theory or the logic of tort law".[19]  Economic loss may be no less real than physical injury and just as foreseeable.  In *Robins*, for example, the charterers' loss of business from the dry dock's negligent delay in repairing the steamship was readily foreseeable, but so would have been the charterers' clients' loss of business, and so on. Justice Holmes' abrupt curtailment of this rippling liability — "[t]he law does not spread its protection so far"[20] — could have been achieved by taking a more restrictive view of foreseeability. But, wrote Professor James,

> judges who have been unwilling to accept narrow and unrealistic views of what is foreseeable — or of what a jury may find to be unforeseeable — remain generally unwilling to allow recovery for indirect economic loss.  The explanation for this reluctance, repeated in decisions over the years, is a pragmatic one: the physical

---

[17] 752 F.2d 1019, 1022 (5th Cir. 1985) (en banc).

[18] 25 VAND. L. REV. 43, 43 (1972) (footnotes omitted).

[19] *Id*. at 44.  *See also* OLIVER WENDELL HOLMES, THE COMMON LAW 1 (Boston, Little Brown & Co., 1881) ("The life of the law has not been logic: it has been experience.  The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed.").

[20] *Robins*, 275 U.S. at 309.

consequences of negligence usually have been limited, but the indirect economic repercussions of negligence may be far wider, indeed virtually open-ended. As Cardozo put it in a passage often quoted, liability for these consequences would be "liability in an indeterminate amount for an indeterminate time to an indeterminate class."[21]

Liability for economic loss directly resulting from physical injury to the claimant or his property — such as lost wages or medical bills — is limited by the scope of the injury. Liability for a stand-alone economic loss is not.[22]

Often, a more appropriate remedy for the victim is to allocate the risk of loss by contract or to cover it through insurance.[23] In Judge Posner's view:

> This is simply generalizing to tort law the contract-law rule of *Hadley v. Baxendale* . . . . The point in *Hadley . . .* was that the carrier could not estimate the loss that the customer would incur from a delay in the delivery of the repaired mill shaft to the customer, but the customer could estimate this cost and, therefore, was in a better position to avoid the loss by taking appropriate precautions or by buying insurance.[24]

Thus, for example, "when a defective product purchased in a commercial transaction malfunctions, injuring only the product itself and causing purely economic loss", protection from that kind of harm, the United States Supreme Court has held (in an admiralty case), should be "left entirely to the law

---

[21] James, *supra* note 18, at 45 (footnotes omitted) (quoting *Ultramares Corp. v. Touche*, 174 N.E. 441, 444 (N.Y. 1931)).

[22] *See* William Powers, Jr. & Margaret Niver, *Negligence, Breach of Contract, and the "Economic Loss" Rule*, 23 TEX. TECH L. REV. 477, 481 (1992) ("One rationale for precluding recovery of pure economic loss in these cases is a fear that the purely economic consequences of a defendant's negligence are not limited by the normal tort limit on the scope of a negligent defendant's liability, foreseeability on a case-by-case basis.").

[23] *See id.* at 481-482 ("Another rationale is that plaintiffs are in a better position than defendants to evaluate their own susceptibility to pure economic loss and protect against the economic loss through first-party insurance.").

[24] Richard A. Posner, *Common-Law Economic Torts: An Economic and Legal Analysis*, 48 ARIZ. L. REV. 735, 739 (2006) (citing *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)).

of contracts" because "the parties may set the terms of their own agreements."[25]  Determining

whether a provision for recovery of economic loss is better left to contract helps delineate between

tort and contract claims.  As one commentator has explained:

> If there is a convincing rationale for the economic loss rule, it is that the rule performs a critical boundary-line function, separating the law of torts from the law of contracts.  More specifically, "[t]he underlying purpose of the economic loss rule is to preserve the distinction between contract and tort theories in circumstances where both theories could apply."[26]

Since Professor James's seminal article, much has been written on the development of the

rule limiting recovery of economic damages in tort actions.[27]  From our review of the cases and

commentary on the subject, we think the principal rationales for the rule are well-summarized by

Dean Farnsworth in the recently approved *Restatement (Third) of Torts: Liability for Economic

Harm*, which we quote at length:

> Economic injuries may be no less important than injuries of other kinds; a pure but severe economic loss might well be worse for a plaintiff than a more modest personal injury, and the difference between economic loss in itself and economic loss resulting from property damage may be negligible from the victim's standpoint.  For several reasons, however, courts impose tort liability for economic loss more selectively than liability for other types of harms.

---

[25] *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 859, 872-873 (1986).

[26] Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 WASH. & LEE L. REV. 523, 546 (2009) (footnotes omitted) (quoting Stewart I. Edelstein, *Beware the Economic Loss Rule*, TRIAL, June 2006, at 42, 43 (2006)).

[27] *See*, *e.g.*, Symposium*, Dan B. Dobbs Conference on Economic Tort Law*, 48 ARIZ. L. REV. 687 (2006); Anita Bernstein, *Keep It Simple: An Explanation of the Rule of No Recovery for Pure Economic Loss*, 48 ARIZ. L. REV. 773, 778 (2006) (citing James, *supra* note 18, at 45-46); Mark P. Gergen, *The Ambit of Negligence Liability for Pure Economic Loss*, 48 ARIZ. L. REV. 749, 764 (2006) (citing James, *supra* note 18, at 44-45); *see also* Jim Wren, *Applying the Economic Loss Rule in Texas*, 64 BAYLOR L. REV. 204, 229 (2012) (citing James, *supra* note 18, at 45).

(1). *Indeterminate and disproportionate liability.* Economic losses proliferate more easily than losses of other kinds. Physical forces that cause injury ordinarily spend themselves in predictable ways; their exact courses may be hard to predict, but their lifespan and power to harm are limited. A badly driven car threatens physical harm only to others nearby. Economic harm is not self-limiting in this way. A single negligent utterance can cause economic loss to thousands of people who rely on it, those losses may produce additional losses to those who were relying on the first round of victims, and so on. Consequences of this sort may be at least generally foreseeable to the person who commits the negligent act. Defendants in such cases thus might face liabilities that are indeterminate and out of proportion to their culpability. Those liabilities may in turn create an exaggerated pressure to avoid an activity altogether.

(2). *Deference to contract.* Risks of economic loss tend to be especially well suited to allocation by contract. First, economic injuries caused by negligence often result from a decision by the victim to rely on a defendant's words or acts when entering some sort of transaction — an investment in a company, the purchase of a house, and so forth. A potential plaintiff making such a decision has a full chance to consider how to manage the risks involved, whether by inspecting the item or investment, obtaining insurance against the risk of disappointment, or making a contract that assigns the risk of loss to someone else. Second, money is a complete remedy for an economic injury. Insurance benefits, indemnification by agreement, or other replacements of money payments are just as good as the money lost in a transaction that turns out badly. This fungibility makes those other ways of managing risk — insurance, indemnity, and the like — more attractive than they might be to a party facing a prospect of personal injury.

Those same points often will make it hard for a court to know what allocation of responsibility for economic loss would best serve the interests of the parties to a risky situation. A contract that settles responsibility for such a risk will therefore be preferable in most cases to a judicial assignment of liability after harm is done. The contract will better reflect the preferences of the parties and help prevent the need for speculation and litigation later. Contracts also are governed by a body of commercial law that has been developed to address economic loss, and thus will often be better suited for that task than the law of torts. In short, contracts to manage the risk of economic loss are more often possible, and more often desirable, than contracts to manage risks of other types of injury. As a result, courts generally do not recognize tort liability for economic losses caused by the breach of a contract between the

parties, and often restrict the role of tort law in other circumstances in which protection by contract is available.[28]

Thus, the *Restatement* concludes, while there is "no general duty to avoid the unintentional infliction of economic loss",[29] the duty may exist when the rationales just stated for limiting recovery are "weak or absent"[30] — *cessante ratione legis cessat et ipsa lex.*[31]

## B

The absence of a bright-line rule, and the failure to analyze whether denying tort recovery for an economic loss in a particular kind of situation is justified by the rationales for limiting recovery of such losses, has led to some confusion. In a 1992 article, then-Professor Powers called Texas law on the subject "murky".[32] One thing certain was that the damage caused by a defective product to itself cannot be recovered in an action for strict products liability,[33] even if there is also

---

[28] *See* RESTATEMENT, T.D. 1, § 1 cmt. c.

[29] *Id.* § 1.

[30] *Id.* § 1 cmt. d.

[31] "When the reason of the law ceases, the law itself also ceases." BLACK'S LAW DICTIONARY App. A 1622 (7th ed. 1999).

[32] Powers, *supra* note 22, at 477. In fairness, Texas does not have a monopoly on the confusion. *See* Johnson, *supra* note 26, at 546 ("The confusing mass of precedent relating to tort liability for economic loss has yet to be disentangled and expressed with the clarity commonly found with respect to other tort law topics.").

[33] This rule was first stated in *Nobility Homes of Texas, Inc. v. Shivers*: "strict liability does not apply to economic losses." 557 S.W.2d 77, 80 (Tex. 1977). The plaintiff suffered only economic damages — the difference between what he paid for a rickety mobile home and what it was worth. *Id.* at 78. But his strict products liability claim also failed because the mobile home, though defective, was not unreasonably dangerous. *Id.* at 79-80; *see also McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 788, 788-789 (Tex. 1967) (adopting the strict liability action defined in section 402A of the *Restatement (Second) of Torts*, which provides for damages caused by a defective product that is unreasonably dangerous). Less than a year after the Court issued its unanimous opinion in *Nobility Homes*, the Court could not agree on what had been the basis for that decision. In *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, the Court held that the decision in *Nobility Homes* had been based on the economic loss rule: "In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to

11

personal injury or injury to other property.[34]   Recovery of such damages must be for breach of contract or warranty.  It was also fairly clear that one party to a contract cannot recover from another party, in an action for negligence, an economic loss to the subject of the contract.[35]

---

the defective product itself is an economic loss governed by the Uniform Commercial Code."  572 S.W.2d 308, 313 (Tex. 1978).  Justice Pope, the author of the Court's opinion in *Nobility Homes*, disagreed: "We did not hold that damages to the product itself defeated an action for strict liability. . . .  The reason that *Nobility* . . . held there was no strict liability case for the product itself was the absence of proof and findings that there was a defect that was unreasonably dangerous that produced the accident."  *Id.* at 314-315 (Pope, J., dissenting).  In a case decided the same day as *Mid Continent*, the Court reiterated its view of *Nobility Homes*, that when "only the product itself is damaged, such damage constitutes economic loss recoverable only as damages for breach of an implied warranty under the [UCC]."  *Signal Oil & Gas Co. v. Universal Oil Prods.*, 572 S.W.2d 320, 325 (Tex. 1978).  We have since reaffirmed: "The economic loss rule applies when losses from an occurrence arise from failure of a product and the damage or loss is limited to the product itself."  *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007) (citations omitted) (the Court, however, did not reach the court of appeals' application of the economic loss rule).

[34] In *Signal Oil*, a defective reactor charge heater installed in a refinery's isomax unit ruptured, causing an explosion and fire that damaged the heater itself as well as other property; the refinery company sued for property damage and economic loss based on, *inter alia,* strict liability and implied warranty theories.  572 S.W.2d at 322-323.  The Court remanded the breach-of-warranty claim for retrial, but concluded that the strict liability claim failed for failure to obtain a matching causation finding.  *Id.* at 324-329, 331.  In so doing, however, the Court noted that plaintiff, in alleging that the explosion and fire damaged not only the reactor heater, but also the catalyst, refinery product, other equipment in the unit, and other property in the area, "properly alleged a cause of action in strict liability" — the Court explained: "Where such collateral property damage exists in addition to damage to the product itself, recovery for such damages are recoverable under Section 402A of the Restatement (Second) of Torts as damage to property or under the Texas Business and Commerce Code, Section 2.715, as consequential damages for a breach of an implied warranty.  To the extent that the product itself has become part of the accident risk or the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss."  *Id.* at 325 (footnote omitted).  This language, in context, recognizes only that collateral property damage may  be recoverable, and cannot be read as permitting recovery based on a products liability theory for damages to a defective product itself if there is also personal injury or injury to other property.  *Cf. Equistar*, 240 S.W.3d at 868 (noting, in holding that Dresser's no-evidence objections failed to preserve a complaint about the jury charge, that "[e]ven if there had been no evidence of a tort duty, there was still no question that Dresser sold the compressor and impellers to Equistar and that implied warranties of merchantability existed at some point as to both"; the damages questions existed in the suit independent of the tort issues).  The damage to the product is an economic loss recoverable in an action for breach of contract or breach of warranty.  *See Murray v. Ford Motor Co.*, 97 S.W.3d 888, 892 (Tex. App.—Dallas 2003, pet. denied) (stating that "[n]o Texas court has applied the *Signal Oil & Gas Co. dicta* [to permit recovery of damages to the product in a strict liability action when accompanied by other injury]").

[35] This Court had held in *Jim Walter Homes, Inc. v. Reed*: "When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone."  711 S.W.2d 617, 618 (Tex. 1986).  *See also Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) ("When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract.").  We have repeatedly reaffirmed this rule.  *Wansey v. Hole*, 379 S.W.3d 246, 248 (Tex. 2012) (per curiam) ("[A] duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim."); *1/2 Price Checks Cashed v. United Auto. Ins. Co.*,

The *Restatement* now concludes generally that "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties."[36] It was less clear twenty years ago, and still is today, the extent to which Texas precludes recovery of economic damages in a negligence suit between contractual strangers, notwithstanding the rule's genesis in such cases, like *Robins*. As Professor Powers observed, "[a]lthough cases between contractual strangers are the paradigm of the traditional 'economic loss' rule, no Texas case involving 'strangers' expressly addresses the economic loss rule."[37] Professor Powers noted that this Court had suggested in dicta that purely economic damages are recoverable in a negligence action between contractual strangers but later appeared to have rejected that possibility.[38]

---

344 S.W.3d 378, 387 (Tex. 2011) ("[U]nder the economic loss rule, we have held that a claim sounds in contract when the only injury is economic loss to the subject of the contract itself."); *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 61 (Tex. 2008) ("'When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract.'" (quoting *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 282 (Tex. 1990), and *Jim Walter Homes,* 711 S.W.2d at 618)); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007) ("The economic-loss rule . . . generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract."). These cases have effectively limited *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947); *see Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998) (explaining and distinguishing, in a fraudulent inducement suit, *DeLanney* and *Jim Walter Homes*); *DeLanney*, 809 S.W.2d at 494-495 (in *Scharrenbeck*, the defendant agreed to repair a water heater; in failing to repair the water heater properly, the defendant breached its contract, and, "[i]n burning down plaintiff's home, the defendant breached a common-law duty as well, thereby providing a basis for plaintiff's recovery in tort") (citing *Jim Walter Homes*); *Jim Walter Homes*, 711 S.W.2d at 618 ("The acts of a party may breach duties in tort or contract alone or simultaneously in both." (citing *Scharrenbeck*)).

[36] *See* RESTATEMENT, T.D. 1, § 3.

[37] Powers, *supra* note 22, at 482.

[38] *Id.* at 486-487. In *Nobility Homes*, the Court stated: "Consumers have other remedies for economic loss against persons with whom they are not in privity. One of these remedies is a cause in negligence." 557 S.W.2d at 83. Professor Powers discounted the statement because the Court cited no authority, and because the defendant had not challenged its liability in negligence in this Court, hence the statement was unnecessary for the judgment. Powers, *supra* note 22, at 486-487. In any event, Professor Powers concluded, *Jim Walter Homes* had "laid to rest" any confusion, *id.* at 487, by stating that "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone", 711 S.W.2d at 618. In *Sharyland Water Supply Corp. v. City of Alton*, we agreed, despite the fact that the parties in *Jim Walter Homes* were in privity. 354 S.W.3d 407, 416 n.10 (Tex. 2011).

13

Since then, Texas courts of appeals have uniformly applied the economic loss rule to deny recovery of purely economic losses in actions for negligent performance of services.[39] Professional malpractice cases are an exception. A client can recover purely economic losses from a negligent lawyer, regardless of whether the lawyer and client have a contract.[40] Lawyer malpractice is actionable as negligence no doubt because agreements regarding legal representation are not required in Texas, except for contingent fees,[41] and until relatively recently have not been the norm. Also, the standards governing legal representation are deeply developed and their application uniform and well-settled. These factors also support negligence actions against other professionals.[42]

---

[39] *Equistar Chems., L.P. v. Dresser-Rand Co.*, 123 S.W.3d 584, 587 (Tex. App.—Houston [14th Dist.] 2003) ("[a]ssuming the compressors themselves are the product, any claim for damage to them had to be brought in a contract or warranty action . . ."), *overruled on other grounds*, 240 S.W.3d 864, 867 n.2, 868 (Tex. 2007) (because the Court held that Dresser failed to preserve any complaint that the jury charge improperly allowed the jury to find both tort and contract damages by a single answer, the Court "express[ed] no opinion" on the court of appeals' discussion and application of the economic loss rule); *Murray v. Ford Motor Co.*, 97 S.W.3d at 891 (recovery denied for fire damage to negligently constructed vehicle) ("The economic loss rule applies to negligence claims as well as claims for strict liability."); *Trans-Gulf Corp. v. Performance Aircraft Servs., Inc.*, 82 S.W.3d 691, 695 (Tex. App.—Eastland 2002, no pet.) (recovery denied for negligent repairs to a plane) ("Simply stated, a duty in tort does not lie under the economic loss rule when the only injury claimed is one for economic damages."); *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 286, 289-290 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (gas lines operator not liable, for negligently marking and placing its lines, to company excavating for electrical conduits in the absence of a contractual relationship or a claim for personal injury or property damages); *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (seismic survey software developer not liable for negligence to a third-party oil and gas company that suffered only economic loss of drilling a dry well); *Indelco, Inc. v. Hanson Indus. N. Am.-Grove Worldwide*, 967 S.W.2d 931, 932-933 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (recovery denied for fire damage to negligently designed crane); *see also Hininger v. Case Corp.*, 23 F.3d 124, 127 (5th Cir. 1994) (recovery denied for lost business due to negligently designed combine).

[40] *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 783 (Tex. 2006) ("Legal malpractice claims sound in tort."); *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989) ("An attorney malpractice action in Texas is based on negligence."); *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988) ("A cause of action for legal malpractice is in the nature of a tort . . . .").

[41] TEX. DISCIP. R. OF PROF'L CONDUCT 1.04(d).

[42] *See, e.g.*, *Murphy v. Campbell*, 964 S.W.2d 265, 269 (Tex. 1997) ("A plaintiff may obtain full redress [for accounting malpractice] in an action for negligence or breach of contract."); TEX. CIV. PRAC. & REM. CODE § 150.001-.003 (governing negligence suits against "licensed or registered professionals", defined to include "a licensed architect,

14

Although Texas courts have repeatedly invoked the economic loss rule to disallow recovery of purely economic losses in actions for negligent services not involving professionals, this Court, without citing the rule, has allowed recovery of such losses in an action for negligent misrepresentation, the cause of action in the present case. We first recognized the action, defined by section 552 of the *Restatement (Second) of Torts*,[43] in *Federal Land Bank Association of Tyler v. Sloane*, where we held that prospective borrowers could recover the costs they incurred (but not lost profits) in relying on their lender's negligent misrepresentation to them that their loan application would be approved.[44] Later, in *McCamish, Martin, Brown & Loeffler v. F.E. Appling*

licensed professional engineer, registered professional land surveyor, registered landscape architect, or any firm in which such licensed or registered professional practices, including but not limited to a corporation, professional corporation, limited liability corporation, partnership, limited liability partnership, sole proprietorship, joint venture, or any other business entity", *id*. § 150.001(1-a)).

[43] Section 552, entitled "Information Negligently Supplied for the Guidance of Others", states:

"(1)    One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2)    Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

"(a)    by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b)    through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

"(3)    The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

RESTATEMENT (SECOND) OF TORTS § 552 (1977). Section 5 of the *Restatement (Third) of Torts: Liability for Economic Harm* "repeats § 552 with small changes." RESTATEMENT, T.D. 1, § 5 cmt. a.

[44] 825 S.W.2d 439, 442-443 (Tex. 1991).

15

*Interests*, we held that while a non-client cannot recover against a lawyer for negligence,[45] a lawyer may be liable for negligent misrepresentation to a non-client, but only in narrow circumstances, "when information is transferred by an attorney to a known party for a known purpose", liability is not expressly limited or disclaimed but invited, and the claimant has "justifiably rel[ied] on a lawyer's representation of material fact", which cannot ordinarily occur in an adversarial context.[46] Most recently, in *Grant Thornton LLP v. Prospect High Income Fund, Ltd.*, we held that an accountant may be liable to a strictly limited group of investors who justifiably rely on negligent misrepresentations in a corporate audit report.[47] But we denied the claims in that case because the plaintiffs were merely potential investors with no special relationship to the audited corporation, and given their knowledge of the corporation and the marketplace, their reliance was not justified.[48]

These cases should not be read to suggest that recovery of economic loss is broader for negligent misrepresentation than for negligent performance of services. We agree with the *Restatement* that "[t]he general theory of liability is the same" for both torts, which is that

> [a] plaintiff's reliance alone, even if foreseeable, is not a sufficient basis for recovery; under either [tort] a defendant generally must act with the apparent purpose of providing a basis for the reliance. It may be useful to say that a defendant held liable under either [tort] must "invite reliance" by the plaintiff, so long as the expression is understood to refer to the defendant's apparent purpose and not to a temptation incidentally created by the defendant's words or acts.[49]

---

[45] *Barcelo v. Elliott*, 923 S.W.2d 575 (Tex. 1996).

[46] 991 S.W.2d 787, 794 (Tex. 1999).

[47] 314 S.W.3d 913, 920 (Tex. 2010).

[48] *Id.* at 921, 923-926.

[49] *See* RESTATEMENT, T.D. 1, § 5 cmt. a.

16

And for both torts, whether and how to apply the economic loss rule "does not lend itself to easy answers or broad pronouncements."[50] Rather, as we have already observed, the application of the rule depends on an analysis of its rationales in a particular situation.

**III**

Eby argues that the economic rule should not apply in this case when it did not bar recovery in our other negligent misrepresentation cases, *Sloane*, *McCamish*, and *Grant Thornton*. LAN/STV counters that to allow such recovery on construction projects, where relationships are contractual and certainty and predictability in risk allocation are crucial, would be disruptive.

Construction projects operate by agreements among the participants. Typically, those agreements are vertical: the owner contracts with an architect and with a general contractor, the general contractor contracts with subcontractors, a subcontractor may contract with a sub-subcontractor, and so on. The architect does not contract with the general contractor, and the subcontractors do not contract with the architect, the owner, or each other.

We think it beyond argument that one participant on a construction project cannot recover from another — setting aside the architect for the moment — for economic loss caused by negligence. If the roofing subcontractor could recover from the foundation subcontractor damages for extra costs incurred or business lost due to the latter's negligent delay of construction, the risk of liability to everyone on the project would be magnified and indeterminate — the same result

---

[50] *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 419 (Tex. 2011).

Justice Holmes rejected in *Robins*. As the *Restatement* explains:

> There is no liability in tort . . . when the owner of a construction project sues a subcontractor for negligence resulting in economic loss; nor is liability found when one subcontractor is sued by another because the negligence of the first drives up the costs of the second. A subcontractor's negligence in either case is viewed just as a failure in the performance of its obligations to its contractual partner, not as the breach of a duty in tort to other subcontractors on the same job, or to the owner of the project. This way of describing the subcontractor's role is not inevitable in all cases. General rules are favored in this area of the law, however, because their clarity allows parties to do business on a surer footing. In this setting, a rule of no liability is made especially attractive by the number and intricacy of the contracts that define the responsibilities of subcontractors on many construction projects. That web of contracts would be disrupted by tort suits between subcontractors or suits brought against them by a project's owner.[51]

The issues are whether to treat the architect differently and whether to distinguish between an action for negligent performance of services and an action for negligent misrepresentations. On the latter issue, we agree with the *Restatement*: "[b]oth [torts] are based on the [same] logic" and "[t]he general theory of liability is the same".[52] The economic loss rule should not apply differently to these two tort theories in the same situation.

On the former issue, we diverge from the *Restatement*. We agree that

> [t]he plans drawn by the architect are intended to serve as a basis for reliance by the contractor who forms a bid on the basis of them and is then hired to carry them out. The architect's plans are analogous to the audit report that an accountant supplies to a client for distribution to potential investors — a standard case of liability [for negligent misrepresentation].[53]

---

[51] RESTATEMENT, T.D. 2, § 6 cmt. b (the comment adds: "Allowing a suit against the architect of a project by a party who made a bid in reliance on a defective plan does not create comparable problems.").

[52] RESTATEMENT, T.D. 1, § 5 cmt. a.

[53] RESTATEMENT, T.D. 2, § 6 cmt. b.

But we think the contractor's principal reliance must be on the presentation of the plans by the owner, with whom the contractor is to reach an agreement, not the architect, a contractual stranger. The contractor does not choose the architect, or instruct it, or pay it. Under *McCamish*, the contractor could not recover economic damages from the owner's lawyer's negligent drafting of the construction contract. And while there is some analogy between the architect's plans and an accountant's audit report, under *Grant Thornton*, the latter is not an invitation to all investors to rely, but only those to whom it is more specifically directed. Here, the architect's plans are no more an invitation to all potential bidders to rely.

The *Restatement* adds that if allowing recovery against the architect in negligence "is not congenial to the parties, they are free to change it in the contracts that link them."[54] But the parties are just as free to provide for liability by contract that the law does not allow in tort. The *Restatement* acknowledges this, noting that if the architect is contractually liable to the owner for defects in the plans, and the owner in turn has the same liability to the contractor, the contractor is protected.[55] But the *Restatement* concludes that while this assignment of risk by contract should be

---

[54] *Id.*

[55] The *Restatement* posits the following situation in illustration 8 to section 3, borrowed from illustration 9 to section 552 of the *Restatement (Second)*:

> City hires Engineer to test soil conditions at a site where it plans to erect a large building. City explains that Engineer's report will be distributed to prospective building contractors for use in estimating their costs. Engineer negligently submits an inaccurate report. Contractor wins the right to perform the construction, having relied on Engineer's report in preparing its bid. Engineer's errors cause Contractor to suffer losses in performing its contract with City. The contracts between Contractor and City, and between City and Engineer, do not preclude a claim by Contractor against Engineer [for negligent performance of services or negligent misrepresentation]. Engineer remains potentially liable to Contractor under either of those [torts].

RESTATEMENT, T.D. 1, § 3 cmt. f. But the *Restatement* adds:

encouraged, it jeopardizes unsophisticated parties:

> Forbidding tort claims between parties who are indirectly linked by contract would put pressure on them to specify their rights carefully in advance, thus sparing courts the need to inquire into them later. But that incentive is most likely to be noticed by sophisticated parties negotiating large projects, and for them the rule is unlikely to be of great importance. They will negotiate allocations of risk that look similar in the end notwithstanding the rule of tort law in the background. Meanwhile, less sophisticated parties would stand a good chance of being tripped up by a broad rule, as when they fail to provide for indemnification in some direction and inadvertently leave a party who has been wronged with no remedy.[56]

We think it more probable that a contractor will assume it must look to its agreement with the owner for damages if the project is not as represented or for any other breach.

Though there remains the possibility that a contractor may not do so, we think the availability of contractual remedies must preclude tort recovery in the situation generally because, as stated above, "clarity allows parties to do business on a surer footing".[57] "Where contracts might readily have been used to allocate the risk of a loss," the *Restatement* observes, "a duty to avoid the loss is unlikely to be recognized in tort — not because the economic loss rule applies, but simply because courts prefer, in general, that economic losses be allocated by contract where feasible."[58] We see no reason not to apply the economic loss rule to achieve this end.

---

> Contractor could have insisted that City guarantee the soundness of Engineer's report, and City could have insisted that Engineer indemnify City for claims brought against it by Contractor. In effect, those contracts would have protected Contractor against the risk of errors by Engineer, and would have ensured that Engineer would bear the costs of its negligence.

*Id.*

[56] *Id.* § 3, reporter's note to cmt. f.

[57] RESTATEMENT, T.D. 2, § 6 cmt. b.

[58] RESTATEMENT, T.D. 1, § 3 cmt. f.

Analyzing the economics of the construction site, Professor Powers proposed this result more than twenty years ago, and we quote his analysis at length:

> In fact, construction disputes . . . are good candidates for precluding recovery under the "economic loss" rule, because the parties are in a position to protect themselves through bargaining. Though the parties do not necessarily have contracts with each other, they typically all have contracts with the owner, or subcontracts with someone who does have a contract with the owner. If contractors want to be protected, they can insist on that protection from the owner who will get protection from the architect. The contractors can take less compensation from the owner, so that the owner can in turn compensate the architect for the added risk.

> The issue is who will buy business protection insurance. It makes sense to let the parties bargain about this rather than impose a "legal" solution. . . .

> There are two additional reasons to decline imposing a general tort duty on architects and engineers. First, imposing the risk of economic loss on the architect requires the architect to pass the cost along to the owner. The owner will then pass the cost along to the various contractors and subcontractors. Different contractors and subcontractors have different susceptibilities to economic loss, but the owner has no way of distinguishing among the various contractors and subcontractors. Some contractors and subcontractors will benefit greatly, some will not. Yet all will pay the price for this protection, not in proportion to their benefit from the protection, but roughly in proportion to the dollar value of their services. This will lead to a cross-subsidization. Contractors and subcontractors who are not subject to losses from delays effectively "pay" for protection that they do not need. In effect, they subsidize other contractors and subcontractors who are more susceptible to this type of loss.

> This inequity could be remedied if the owner could determine which contractors and subcontractors benefit most and then charge them more by paying them less. But this would require the owner to be in the business of evaluating contractors' susceptibility to economic loss, which would effectively put the owner in the insurance evaluation business. Individual contractors and subcontractors are in a better position to evaluate their own susceptibility to economic loss and determine whether to buy insurance. Thus, fairness and efficiency support leaving these losses on the contractors and subcontractors, who can decide for themselves whether and for how much to insure. I assume this is part of the explanation why current contractual practice does not shift these obligations to the architect.

21

Second, . . . contracts between owners and supervising architects can vary. Sometimes the supervising architect might be hired for the benefit of the contractors and subcontractors. However, in most cases, the architect is hired either as a neutral arbitrator or, most often, as the agent of the owner. . . . If the architect is supposed to be neutral or to operate as the agent of the owner, negligence principles — which would be decided by the jury after the fact — would create a chilling effect on the architect's neutrality or fiduciary duty to the owner.

This analysis suggests that each situation is different and that courts should use contract principles[,] not tort principles, to determine whether the architect has "contractual" obligations to the contractors and subcontractors.[59]

Finally, the courts are fairly evenly divided over whether to apply the economic loss rule in this situation.[60] We side with those who do.

DART was contractually responsible to Eby for providing accurate plans for the job. Eby agreed to specified remedies for disputes, pursued those remedies (when the federal court would not allow it to sue), and settled its claims for $4.7 million. Had DART chosen to do so, it could have

---

[59] Powers, *supra* note 22, at 521 n.205 (citation omitted).

[60] The following cases apply the economic loss rule: *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004); *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 566 A.2d 31 (D.C. 1989); *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160, 679 N.E.2d 1197 (1997); *Terracon Consultants Western, Inc. v. Mandalay Resort Grp.*, 206 P.3d 81 (Nev. 2009); *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*, 560 N.E.2d 206 (Ohio 1990); *SME Indus., Inc. v. Thompson, Ventulett, Stainback and Assoc., Inc.*, 28 P.3d 669 (Utah 2001); *Blake Constr. Co., Inc. v. Alley*, 353 S.E.2d 724 (Va. 1987); *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist.*, 881 P.2d 986 (Wash. 1994); *Excel Constr., Inc. v. HKM Eng'g, Inc.*, 228 P.3d 40 (Wyo. 2010).

The following do not: *Sullivan v. Pulte Home Corp.*, 306 P.3d 1 (Ariz. 2013) (noting that *Donnelly Constr. Co. v. Oberg/Hunt/Gilleland*, 677 P.2d 1292 (Ariz. 1984), correctly implied that the economic loss doctrine would not apply to negligence claims by a plaintiff who has no contractual relationship with the defendant (citation omitted)); *A. R. Moyer, Inc. v. Graham*, 285 So. 2d 397 (Fla. 1973) (though this case was limited to its facts, the economic loss doctrine was thereafter limited to products liability cases; *see Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013)); *Craig v. Everett M. Brooks Co.*, 222 N.E.2d 752 (Mass. 1967); *Prichard Bros., Inc. v. Grady Co.*, 428 N.W.2d 391 (Minn. 1988); *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005); *Forte Bros., Inc. v. Nat'l Amusement, Inc.*, 525 A.2d 1301 (R.I. 1987); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85 (S.C. 1995); *Eastern Steel v. City of Salem*, 549 S.E.2d 266 (W. Va. 2001).

For a survey of case law both ways, *see* Marc Schneier, Annotation, *Tort Liability of Project Architect or Engineer for Economic Damages Suffered by Contractor or Subcontractor*, 61 A.L.R.6th 445 (2011).

sued LAN/STV for breach of their contract to provide accurate plans. But Eby had no agreement with LAN/STV and was not party to LAN/STV's agreement with DART. Clearly, the economic loss rule barred Eby's subcontractors from recovering their own delay damages in negligence claims against LAN/STV. We think Eby should not be treated differently.

*    *    *    *    *

The reasons for the economic loss rule support its application in this case to preclude a general contractor from recovering delay damages from the owner's architect. Accordingly, we reverse the judgment of the court of appeals and render judgment that Eby take nothing from LAN/STV.

Nathan L. Hecht
Chief Justice

Opinion issued: June 20, 2014