

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00240-CV

HENRY RAHMANI AND RAHMANI                                    APPELLANTS
MANAGEMENT, LLC

V.

DAN BANET                                                    APPELLEE

----------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 96-241990-09

----------

## MEMORANDUM OPINION[1] ON REHEARING

----------

### I. Introduction

Appellants Henry Rahmani and Rahmani Management, LLC (collectively, appellants) filed a motion for rehearing. We deny the motion but withdraw our opinion of March 26, 2015, and substitute the following in its place.

---

[1]*See* Tex. R. App. P. 47.4.

Appellee Dan Banet, who was involved in various business ventures with appellants, sued appellants for breach of contract, fraud, conversion, and breach of fiduciary duty.

Along with Rahmani's and Banet's testimonies, the trial court admitted into evidence Plaintiff's Exhibits 5 and 6, two versions of the parties' agreement for the transfer of Banet's shares in WWWDH, LP, one of their business ventures. Rahmani claimed that Plaintiff's Exhibit 5 had been modified and that Plaintiff's Exhibit 6, bearing initials on each page and providing for no payment to Banet, was the real contract. Banet claimed that Plaintiff's Exhibit 5, which provided for a $200,000 payment for Banet's WWWDH, LP shares, was a true and correct copy of the real contract, that he had never initialed the agreement, that the initials on Plaintiff's Exhibit 6 were not his despite appearing to be in his handwriting, and that anyone who claimed that Plaintiff's Exhibit 6 was the original agreement was lying.

At the trial's conclusion, the jury was asked sixteen questions on Banet's causes of action and two questions on appellants' usury defense. Ten out of twelve jurors issued a verdict for Banet on his claims and found that Banet had not contracted for, charged, or received usurious interest. The trial court granted Rahmani's motion to disregard the jury's answers to Questions 10, 11, 12, 13,

2

and 14.[2] The final judgment awarded $200,000 to Banet against both appellants, jointly and severally, and an additional $35,000 to Banet against Rahmani, in addition to joint and several attorney's fees and pre- and post-judgment interest.

In six issues, appellants appeal the trial court's judgment for Banet. In a single cross-point, Banet contends that the trial court erred by granting appellants' motion to disregard jury findings as to his breach of fiduciary duty and fraud claims. We modify the trial court's judgment to delete Banet's $35,000 recovery against Rahmani, which requires us to reverse the portion of the judgment awarding attorney's fees to Banet and to remand that portion of the case for a new trial. We overrule Banet's cross-point and affirm the remainder of the trial court's judgment.

## II. Admissibility of Evidence

In their first issue, appellants argue that "admission into evidence of [Plaintiff's Exhibit 5,] a photocopy of the alleged contract[,] was error where the original was not produced or accounted for" because Banet failed to comply with rule of evidence 1004's requirements, making the document inadmissible. They complain that Banet had the burden to prove the terms of the agreement and that "[t]he only evidence offered by Dan Banet on that issue was a photocopy of the alleged agreement."

---

[2]Questions 10 and 11 pertained to Banet's fraud claim and damages; Questions 12, 13, and 14 pertained to Banet's breach-of-fiduciary-duty claim and damages.

3

However, Banet testified about the alleged agreement's terms without any objection by appellants. Specifically, Banet testified that he agreed to transfer his shares in the company to Rahmani in exchange for Rahmani's agreement to pay him $200,000 for those shares—the portion of Plaintiff's Exhibit 5 that is different from Plaintiff's Exhibit 6, which appellants contended was the real contract. Because any error in the admission of evidence is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection, *see Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007); *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004), we overrule appellants' first issue without needing to reach their rule 1004 argument.[3]

---

[3]We nonetheless note that under the abuse of discretion standard of review applied to the trial court's evidentiary rulings, *see Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011), and in light of the requirement that we uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling, *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998), the trial court does not appear to have abused its discretion by admitting Plaintiff's Exhibit 5. *See, e.g.*, *Scott v. U.S. Bank, Nat'l Ass'n*, No. 02-12-00230-CV, 2014 WL 3535724, at *5 (Tex. App.—Fort Worth July 17, 2014, no pet.) (mem. op.) (stating that trial court did not abuse its discretion by determining exhibit—a copy—was admissible under rule of evidence 1004 when the bank claimed it sent the original to appellants and appellants claimed that they never received it); *cf. Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583–84 (Tex. 1984) (holding that unexecuted "sworn copy" of note that was allegedly prepared for debtors to sign, without explaining failure to produce the original or a copy of the executed note, was inadmissible summary judgment evidence).

4

### III. Usury

In their fourth issue, appellants argue that the great weight and preponderance of the credible evidence established that the alleged contract was usurious, that the statutory usury penalty exceeds the amount of Banet's claim under the alleged contract, and that an offset for the usury penalty should result in no recovery by Banet. Appellants further argue that once the usurious contract was signed, Banet could not avoid liability by failing or refusing to collect the usurious interest, essentially arguing that Banet is liable for contracting for usurious interest if not for actually charging it.

Banet responds that the jury considered and rejected appellants' usury argument, that the finance code sections cited by appellants—sections 303.009, 303.012, and 305.001[4]—do not apply to these parties and this case, and that the evidence does not support appellants' claim that Banet ever sought usurious interest.

### A. Statutory Usury

Finance code section 305.001, "Liability for Usurious Interest," provides for liability of a "creditor" who contracts for, charges, or receives interest in an

---

[4]Finance code section 303.009 sets out interest ceiling rates from 18% to 24% per year, while under finance code section 303.012, a court may take judicial notice of interpretations issued by the consumer credit commissioner or information published in the Texas Register under section 303.011. Tex. Fin. Code Ann. § 303.009 (West 2006 & Supp. 2014), § 303.012 (West 2006). Section 305.001 provides for liability under the usury statutes; we discuss it in greater detail below. *See id.* § 305.001 (West 2006).

amount greater than authorized by statute in a transaction for personal, family, or household use and for liability of a "creditor" who contracts for or receives interest that is greater than the amount authorized by statute in connection with a commercial transaction.[5] Tex. Fin. Code Ann. § 305.001(a), (a-1), (b). The statute applies in the disjunctive. *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 340 (Tex. 1980) ("The statute providing penalties for usury applies in the disjunctive to either a contract for, a charge of, or receipt of usurious interest, and any one of these triggers the penalty provisions."). However, usury statutes are penal in nature and are strictly construed: "[I]f there is any doubt as to legislative intent to punish the activity complained of under usury statutes, the doubt must be construed in favor of the lender." *Starr v. Dart*, No. 14-07-00673-CV, 2008 WL 2841685, at *2 (Tex. App.—Houston [14th Dist.] July 24, 2008, pet. denied) (mem. op.).

Whether Banet could be liable for usury under section 305.001 depends on whether Banet is a "creditor" under title 4 of the finance code. To be usurious, a contract on its face must purport to entitle a creditor, upon the happening of a contingency or otherwise, to exact interest in an amount greater than that allowed by law. *W.E. Grace Mfg. Co. v. Levin*, 506 S.W.2d 580, 584 (Tex. 1974); *see also First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex.

---

[5]No one argues that the transaction here involved personal, family, or household use, so the jury should have been charged, if at all, under subsection (a-1) for commercial transactions.

1994) (stating that a usurious transaction is composed of (1) a loan of money, (2) an absolute obligation to repay the principal, and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower); *Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 96 (Tex. App.— Houston [1st Dist.] 2006, pet. denied) (stating that a transaction missing any of the three required usurious-transaction elements cannot be usurious). When a contract does not involve a lending or credit transaction or debtor-creditor relationship, the usury statutes do not apply. *See Villanova v. Fed. Deposit Ins. Corp.*, No. 08-11-00361-CV, 2014 WL 2881540, at *6, *8 (Tex. App.—El Paso June 25, 2014, no pet.) (holding that breach of settlement agreement that resulted in foreclosure was not the type of agreement governed by the usury statutes); *Starr*, 2008 WL 2841685, at *1, *3–4 (holding that settlement agreement in which Dart agreed to dismiss lawsuit and transfer his stock to Starr in consideration for $424,000, paid in three installments, with an additional $1,000 per day for any late payments, was not the type of contract to which the usury laws applied despite $1,000 per day late fee); *see also Jones v. R.O. Pomroy Equip. Rental, Inc.*, 438 S.W.3d 125, 133 (Tex. App.—Eastland 2014, pet. denied) (holding that usury laws do not apply to rental transactions).

Under the finance code, a "creditor" is a person who loans money or otherwise extends credit but who is not a judgment creditor.[6] Tex. Fin. Code

---

[6]An earlier version of the finance code applied usury penalties to "any person" who contracted for, charged, or received interest, and defined "person"

7

Ann. § 301.002(a)(3) (West 2006); *see also 271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*, No. 03-07-00498-CV, 2008 WL 2387630, at *9 (Tex. App.—Austin June 11, 2008, no pet.) (mem. op.) ("[T]he plain meaning of 'creditor' includes suppliers of goods or services when they charge interest on past due amounts.'"). A "loan" is an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to pay the creditor; it does not include a judgment. Tex. Fin. Code Ann. § 301.002(a)(10).

## B. The Clause

Plaintiff's Exhibit 5, the contract that Banet claimed was the parties' agreement, contained the following clause, which states in pertinent part:

### PURCHASE PRICE

The Principles [sic] agrees [sic] to pay the Transferee a sum of $200,000. The sum of $200,000 shall be paid on or before Sept. 1st 2008. If the Principles [sic] default, the Transferee will have the right to impose a default charge equal to $20,000 with interest of 10%

as "an individual, partnership, corporation, joint venture, trust, association[,] or any legal entity, however organized." Act of May 4, 1967, 60th Leg., R.S., ch. 274, § 2, arts. 1.01(e), 8.01, 1967 Tex. Gen. Laws 608, 609, 656, *repealed by* Act of May 22, 1997, 75th Leg., R.S., ch. 1008, § 6, 1997 Tex. Gen. Laws 3601, 3601–03. However, in 1999, the legislature defined "creditor," defined "loan," clarified that liability for usurious interest applied to "[a] creditor who contracts for, charges, or receives interest that is greater than the amount authorized by this subtitle," and provided that section 305.001(b) applied only to a contract or transaction subject to this subtitle. *See* Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.18(a), secs. 301.002(3), (10), 305.001(a)–(b), 1999 Tex. Gen. Laws 222, 222, 233, *amended by* Act of May 29, 2005, 79th Leg., R.S., ch. 1018, §§ 1.01–8.02, 2005 Tex. Gen. Laws 3438, 3438–63 (current version at Tex. Fin. Code Ann. §§ 301.002, 305.001 (West 2006)).

monthly on the balance, continuing until payment is made in full. The Transferee agrees to give his 50% of shares to the Principle. The Principle will have ownership of 100% of WWWDH LP.

Jury Question 17 asked,

Did Banet contract for, charge, or receive interest that is greater than the maximum amount authorized by law?

"Interest" is the compensation a creditor charges for the use, forbearance, or detention of money.

For a contract made for business, commercial, investment or similar purpose, the maximum lawful interest rate which a creditor may charge is 18% per year.

Neither party objected to Question 17 during the charge conference. The jury answered "No" in response to Question 17.

## C. Analysis

We must examine the form of the transaction and its substance in determining the existence or non-existence of usury. *Anglo-Dutch*, 193 S.W.3d at 97 (citing *Gonzales Cnty. Sav. & Loan Ass'n v. Freeman*, 534 S.W.2d 903, 906 (Tex. 1976)). To determine whether a transaction should be classified as a loan, we look to the parties' intent as revealed by the contract and surrounding circumstances. *Bray v. McNeely*, 682 S.W.2d 615, 617 (Tex. App.—Houston [1st Dist.] 1984, no writ). And we must determine whether the clause creates a creditor-debtor relationship.

The contract provides for Banet to exchange his 50% of the limited partnership shares for appellants' agreement to pay $200,000 by September 1, 2008, with a failure to pay the $200,000 by that date resulting in a default charge

9

of $20,000 "with interest of 10% monthly on the balance." The contract is not a negotiable instrument and advances no funds to appellants. *Cf.* Tex. Bus. & Com. Code Ann. § 3.104(a) (West 2002 & Supp. 2014) (defining "negotiable instrument"). It was drafted by a layman and sets out what would be usurious interest if it were a loan, but it does not meet the definition of "loan" under the finance code. *Cf.* Tex. Fin. Code Ann. § 301.002(a)(10). And although appellants refer to it as a "loan transaction set out in Dan Banet's version of the contract," they do not explain how the parties' agreement to exchange partnership shares for money became a loan transaction subject to the finance code or otherwise constituted an extension of credit by Banet to appellants. *Cf. Dunnam v. Burns*, 901 S.W.2d 628, 631 (Tex. App.—El Paso 1995, no writ) ("When money is advanced in exchange for an obligation to repay the advance plus an additional amount, the added amount is interest that may not exceed the statutory maximum."). Therefore, we conclude that as a matter of law, Banet was not a creditor under the finance code to whom the usury statutes would apply,[7] and we overrule appellants' fourth issue.[8]

---

[7]Additionally, other than Banet's pleadings, appellants refer this court to nothing in the record to show that Banet ever sought to enforce the controversial provision. A pleading, by itself, "'even if it contains a claim for usurious interest, does not constitute a 'charge' of usurious interest for the purposes of the Texas usury statute.'" *Williams v. Bell*, 402 S.W.3d 28, 37 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (quoting *D&S Kingsway Ventures v. Tex. Capital Bank– Richmond, N.A.*, 882 S.W.2d 573, 575 (Tex. App.—Houston [14th Dist.] 1994, no writ)); *see also George A. Fuller Co. of Tex., Inc. v. Carpet Servs., Inc.*, 823 S.W.2d 603, 605 (Tex. 1992) ("Usury statutes are designed to correct abusive practices in consumer and commercial credit transactions, not to serve as a trap

## IV. Plea in Abatement

In their third issue, appellants argue that the trial court abused its discretion when it denied their plea in abatement and refused to order that Banet's ex-wife be made a party and alternatively that Banet's recovery on the contract action should be reduced to delete the part of the claim owned by his ex-wife. They base this argument on the fact that the alleged contract was made in late September 2008 but Banet's divorce was not finalized until December 2008 in a divorce decree that did not divide the community interest in the contract or Banet's claims against appellants. Appellants complain that the trial court's failure to join Banet's ex-wife potentially subjected them to multiple suits and uncertain liability and that Banet had no standing to pursue his ex-wife's claims in the trial court.

Banet responds that because his ex-wife was not a party to any of the agreements or the owner of any of the companies made the basis of this suit, there was no need to abate to make her a party. Banet is correct—because his ex-wife was not a party to the alleged contract, she therefore lacked standing to bring a breach-of-contract claim against appellants. *See* Tex. Fam. Code Ann.

---

for the unwary pleader in a court proceeding."). Likewise, nothing in the record indicates that Banet ever received any interest from appellants.

[8]Although the trial court should not have submitted Jury Question 17 to the jury, because the jury answered it in the negative, any such error was harmless. *See* Tex. R. App. P. 44.1(a); *cf. Catalina v. Blasdel*, 881 S.W.2d 295, 296 (Tex. 1994) (stating that usury, when not apparent from an instrument's face, is a fact question for a jury).

§ 3.102(a) (West 2006) (defining sole management community property), § 3.104(a) (West 2006) (setting out sole management community property presumption); *Wells v. Dotson*, 261 S.W.3d 275, 284–85 (Tex. App.—Tyler 2008, no pet.) (explaining that although parties were married, because husband entered contract in his name only, it was presumed to be his sole management community property for which he had the sole authority to bring an action related to it); *see also Heartland Holdings, Inc. v. U.S. Trust Co. of Tex. N.A.*, 316 S.W.3d 1, 7 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("Generally, in order to enforce a contract, a litigant must be either a party to that contract or an intended third-party beneficiary."); *Bell v. Moores*, 832 S.W.2d 749, 752 (Tex. App.—Houston [14th Dist.] 1992, writ denied) ("It is a fundamental rule of law that only the person whose primary legal right has been breached may seek redress for an injury.").

Although appellants are correct in stating that the divorce decree did not mention Banet's $200,000 breach-of-contract claim against appellants, when a divorce decree does not dispose of an asset, a suit by the ex-spouse against his or her former spouse for partition of the former community property is the appropriate remedy. *See Harrell v. Harrell*, 692 S.W.2d 876, 876 (Tex. 1985) ("It has long been the rule in Texas that community property not partitioned or divided upon divorce is held by the former spouses as tenants in common or joint owners."). That is, Banet's ex-wife's claim, if any, would be against Banet for partition of his breach-of-contract recovery, not against appellants. *See*

12

*Stephens v. Marlowe*, 20 S.W.3d 250, 254 (Tex. App.—Texarkana 2000, no pet.) (stating that the plaintiff in a partition action bears the burden to prove that the divorce court did not consider or dispose of the asset); *see also* Tex. Fam. Code Ann. § 9.201 (West 2006) (providing that either former spouse may file a suit to divide property not divided or awarded to a spouse in a final decree of divorce). We overrule appellants' third issue.

## V.  Sufficiency

In their second, fifth, and sixth issues, appellants argue that the evidence is legally and factually insufficient to support the judgment against Rahmani Management, LLC for $200,000; to support the award of attorney's fees to Banet; and to support the judgment against Rahmani for the additional sum of $35,000.

## A.  Standards of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable

13

factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When the party without the burden of proof on a fact issue complains of an adverse fact finding, that party must show that there is "insufficient evidence" supporting the finding; that is, that the credible evidence supporting the finding is too weak or that the finding is against the great weight and preponderance of the credible evidence contrary to the finding. *See Garza*, 395 S.W.2d at 823; W. Wendall Hall, *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 3, 41–42 (2010).

14

**B. Judgment against Rahmani Management, LLC for $200,000**

In their second issue, appellants claim that Plaintiff's Exhibit 5 requires payment only from Rahmani and not from Rahmani Management, LLC when (1) the contract's language "makes it clear that 'Principle' refers only to Henry Rahmani, not to Rahmani Management, LLC," (2) Rahmani Management, LLC received nothing in the transaction and remained as the general partner holding only a 1% interest, and (3) Banet testified that Rahmani owed him $200,000 but did not testify that Rahmani Management, LLC owed him $200,000.

**1. Ambiguity**

Whether a contract is ambiguous is a question of law for the court; when a contract is ambiguous, its interpretation becomes a fact issue for the jury to resolve. *Coker v. Coker*, 650 S.W.2d 391, 394–95 (Tex. 1983); *see Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (stating that a contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation); *cf. David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (stating that an unambiguous contract will be enforced as written). Whether parties intend to be bound by the terms of an agreement is also a question of fact for the jury.[9]  *Cleveland Reg'l*

_____

[9]Here, Jury Question 1 asked, "Did either of the parties named below agree to pay Banet $200,000 for his 50% ownership interest in WWWDH, L.P.?" Jury Question 2 asked, "Did either of the parties named below fail to comply with that agreement?"  The jury answered "Yes" to both Rahmani and Rahmani Management, LLC in each question.

*Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 334 (Tex. App.—Beaumont 2010, pet. denied).

We begin our review of the evidence with the pertinent portions of Plaintiff's Exhibit 5, to determine whether the trial court could have found the contract ambiguous. Plaintiff's Exhibit 5 begins by identifying itself as a contract "by and between Rahmani Management, LLC, Henry Rahmani and Daniel Banet." The sentence that immediately follows this identification states, "Daniel Banet hereinafter collectively referred to as 'Transferee,' and Henry Rahmani Assignee hereinafter, referred to as 'Principle.'" The recitals refer to the "Principle" and the "Transferee" as "individuals or entities residing in Tarrant County, Texas" and "the owners of a Limited Partnership called WWWDH, LP," and state that "Transferee is desirous of withdrawing his 50% shares from WWWDH LP and Principle is desirous of acquiring 50% [of the] shares from the Transferee of WWWDH LP . . . ."

As set out above in our usury discussion, the paragraph addressing purchase price states, "The Principle will have ownership of 100% of WWWDH LP." The contract was executed by "PRINCIPLE: Rahmani Management, LLC, General Partner," signed by Rahmani, first as manager and then as limited partner. *See Tukua Inv., LLC v. Spenst*, 413 S.W.3d 786, 794 (Tex. App.—El Paso 2013, pet. denied) (noting that traditionally, the presence or absence of signatures on a contract is relevant in determining whether the contract is binding on the parties).

16

Based on the above, the trial court could have reasonably concluded that there was an ambiguity with regard to whether Rahmani and Rahmani Management, LLC each intended to be bound. *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999) (stating that the trial court has broad discretion in submitting a charge to the jury as long as the charge is legally correct).

### 2. Additional Evidence

Rahmani testified that he was the sole owner of Rahmani Management, LLC. When he and Banet created WWWDH, LP in 2004, Banet owned 50% as a limited partner, Rahmani owned 49% as a limited partner, and Rahmani Management, LLC owned 1% as the general partner. Plaintiff's Exhibit 3, a February 4, 2004 memorandum, signed by Rahmani for Rahmani Management, LLC and for himself and signed by Banet, states in pertinent part:

> Hereby, the general partner, herein noted as Rahmani Management, LLC, has full legal authorization to act as Executor including, but not limited to, the following: Establishing loan accounts; establishing checking, savings, and money market accounts; withdrawing, transferring, and depositing funds; sale of real estate property and land, purchase of real estate property and land; all legal representation, etc., concerning all legal and financial matters or otherwise for WWWDH, L.P.

With regard to Plaintiff's Exhibit 6,[10] Rahmani testified that he signed the transfer of shares agreement as limited partner and as manager for Rahmani

---

[10]All of the pertinent provisions in Plaintiff's Exhibit 5, except for payment of $200,000 for the shares, are identical to those set out in Plaintiff's Exhibit 6. Rahmani testified that he never promised to pay Banet a single dollar for his

Management, LLC, and entered the agreement on behalf of himself and Rahmani Management, LLC.

During cross-examination, the following dialogue occurred between appellants' counsel and Banet:

> Q. But in this lawsuit, you sued Rahmani Management, LLC, this limited liability company. You've—You've sued them. Are you suing them for the same $200,000?
>
> A. No, sir.
>
> Q. Okay. So, basically, Henry Rahmani is the only one that owes you $200,000?
>
> A. I only want what's fair, what was offered to me. Yes, sir.[11]

---

interest in WWWDH. Plaintiff's Exhibit 6's purchase price section states, in pertinent part,

> Since the Principles [sic] contributions to the Partnership exceeded the Transferees [sic] contribution. The Transferee agrees to give his 50% of shares to the Principle. The Principle will have ownership of 100% of WWWDH LP for his contribution. The Transferee will have no further obligations to pay the Principle any further monies.

Banet testified that Rahmani tried to get him to sign a transfer agreement indicating that the shares were being transferred for no money "in case your wife needs it for the divorce," that Banet refused, and that Rahmani also told him that if he signed the agreement to sell the shares for no money, Rahmani would still pay him.

[11]In his live pleading, Banet sought "damages for all sums contractually due and owing pursuant to the terms of the contracts and agreements between the parties. Such damages include, but are not limited to the Two Hundred Thousand ($200,000) Dollars due under the 'Transfer of Shares of the Partnership of WWWDH, LP.'" Banet asked to recover judgment "against Defendants for damages as above alleged."

18

During his redirect examination, Banet said that he had drafted Plaintiff's Exhibit 5 and that he was a nonlawyer with no legal training.

### 3. Analysis

Based on the evidence set out above, particularly with regard to the percentages of ownership,[12] the jury could have reasonably concluded that Rahmani Management, LLC was liable on the contract along with Rahmani. Likewise, we cannot conclude that the credible evidence supporting the finding is so weak, or so contrary to the weight of all of the evidence, that the answer should be set aside and a new trial ordered. Therefore, we hold that the evidence is legally and factually sufficient to support the jury's findings, and we overrule appellants' second issue.

## C. Judgment against Rahmani for $35,000

In part of their sixth issue, appellants argue that the evidence is legally and factually insufficient to support the $35,000 judgment against Rahmani because Plaintiff's Exhibit 1's plain language reflects a lack of consideration to pay that amount.[13] Banet responds that this claim relates to both written and verbal

---

[12]That is, with the transfer of Banet's shares, Rahmani would have possessed only 99% of WWWDH, LP's shares if he stood alone as the "Principle," and Rahmani Management, LLC would possess only 51% of WWWDH, LP's shares if it stood alone as the "Principle." Rahmani and Rahmani Management, LLC would only possess 100% of WWWDH, LP's shares if they were considered together to be the "Principle."

[13]In Question 4, the jury was asked, "Did Rahmani agree to pay Banet the proceeds from the *WWWDH, L.P. v. Reliant* litigation?" Question 5, conditioned on an affirmative answer to Question 4, asked the jury whether Rahmani had

representations that Banet would be paid the proceeds of a matter that was ongoing at the time he sold his ownership interest in WWWDH, LP, and that Plaintiff's Exhibit 1 is not the sole evidentiary basis for the claim.

### 1. Consideration

Consideration is a present exchange bargained for in return for a promise and consists of either a benefit to the promisor or a detriment to the promisee. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). The detriment must induce the making of the promise, and the promise must induce the incurring of the detriment. *Id.* A promisor "benefits" when it acquires a legal right to which it would not otherwise be entitled in exchange for a promise, while a promisee suffers a legal "detriment" when, in return for a promise, the promisee surrenders a legal right that it otherwise would have been entitled to exercise. *Bryant v. Cady*, 445 S.W.3d 815, 820 (Tex. App.—Texarkana 2014, no pet.) (citing *N. Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex. 1998)). Lack of consideration occurs when the contract, at its inception, does not impose obligations on both parties. *Id.* A contract that lacks consideration is unenforceable. *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 28 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (op. on reh'g); *see also Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 225 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that consideration can be established by part performance by

---

failed to comply with the agreement. The jury replied "Yes" to both questions and awarded $35,000 to Banet as his damages on that issue.

20

the promisee), *cert. denied*, 559 U.S. 1036 (2010); *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 725 (Tex. App.—Fort Worth 2008, pet. dism'd) (defining consideration as benefits accruing to one party, such as a right, interest, profit, or benefit, and detriments accruing to the other, such as forbearance, loss, or responsibility that is undertaken or incurred).

### 2. Evidence

Plaintiff's Exhibit 1, a document entitled, "AGREEMENT BETWEEN HENRY RAHMANI AND DANIEL BANET," was signed by Rahmani on February 1, 2009, and Banet on February 2, 2009. It set out the following:

> To whom it may concern:
>
> Proceeds from the following cases: Fars VS Yenigani, WWWDHLP VS Reliant Heating/AC can be distributed into 100% to Daniel Banet and wired into his personal account.
>
> It is also agreed that Henry Rahmani and Daniel Banet will split the proceeds 50/50 from Planet BooBoo (Planet Beach) as the contract is stated with Shelly and Randy Nedrow.[14]
>
> Henry also agrees to pay Daniel $5,000 on April 1st and $10,000 on May 15th, 2009. *If proceeds do not come by these dates, this will be reimburse[d] to Henry.*[15]

---

[14]Planet Beach tanning salon was owned by Sherakat, L.P. Sherakat's ownership was comprised of Banet (50%), Rahmani (49%), and Rahmani Management, LLC (1%). Sherakat sold Planet Beach to the Nedrows in 2007. Rahmani agreed that when Planet Beach was sold, Banet would have been entitled to 50% of the sales proceeds with or without the February 2, 2009 agreement. Rahmani had no evidence that he had paid Banet his share of the sales proceeds in cash. Banet said that he did not receive any portion of the Planet Beach sales proceeds.

[15]Rahmani testified that he paid Banet $5,000 in cash in April but had no witnesses and that he did not pay Banet $10,000 in May. He further testified that

The italicized portion of the document was handwritten.

Rahmani testified that the litigation involved WWWDH's lawsuit against Reliant for removing the air conditioners from WWWDH's building during a dispute over final payment. Rahmani also testified as follows:

Q. But the amount of the settlement ended up being $35,000—

A. Yes, sir.

Q. —that you actually did, indeed, collect?

A. Yes, we collected.

Q. And Mr. Banet was never paid any portion of—of that money?

A. No, sir.

Q. But he was a partner and half-owner of the company at the time the dispute arose?

A. No, sir.

Q. Well, at the time the air conditioners were taken off the building, wasn't he still a half-owner of the company?

A. Yes.

Banet testified that with regard to Reliant, he had put air-conditioning condensers on his personal credit card. He also testified that Plaintiff's Exhibit 1

he did not collect on the *Fars* judgment and so did not pay Banet anything from it. Banet said that a $500 check was the only cash payment he had received from Rahmani on anything Rahmani owed him or for anything Banet was entitled to with regard to their business ventures.

arose when Rahmani visited him in Belize to "settle those loose ends" on the companies that they owned, a point in time during which he was still anticipating the $200,000 he believed would come from the sale of his WWWDH, LP shares. Banet testified that Rahmani was not to receive anything from him in return for their February 2009 agreement to pay him the Reliant settlement; he also testified that this "agreement" had been a stall tactic to continue to avoid paying the $200,000 that Rahmani owed him under the WWWDH, LP agreement signed by the parties in September 2008.

The trial court admitted Plaintiff's Exhibit 9, an April 1, 2009 email from Rahmani to his lawyer. In the email, Rahmani stated, "Per our phone call yesterday, Would you please wire the $35,000.00 recovery from settlement with HVAC Company to WWWDH Acc." The same exhibit shows an email from Banet later that day to the same lawyer, stating, "Greg[,] please do not wire these funds, these funds are to be sent to me 100%. Evidently there is a dispute, please hold these funds until the matter is resolved." Banet said that when he saw Plaintiff's Exhibit 9 showing that Rahmani had intercepted the funds, he knew that he had been "had," and he hired an attorney. Rahmani never paid Banet anything from the Reliant litigation.

### 3. Analysis

As set out above, the evidence pertaining to the $35,000 agreement is legally insufficient to show a valid oral or written agreement between the parties because it discloses a complete absence of a vital fact—consideration to support

23

the agreement. *See Hall*, 292 S.W.3d at 26–28 (holding that agreement was unsupported by consideration when unambiguous writing and circumstances reflected no detriment to appellant or benefit to appellee); *see also Uniroyal*, 977 S.W.2d at 334. Therefore, we sustain this portion of appellants' sixth issue, render a take-nothing judgment for Rahmani on the $35,000 claim, and do not reach the remainder of their arguments under this issue. *See* Tex. R. App. P. 47.1. Because we have sustained this portion of appellants' sixth issue, reducing the overall damages award against Rahmani by $35,000, and because we cannot be reasonably certain that the jury was not significantly influenced by the erroneous amount of damages it considered with regard to Rahmani, we must remand the case for a redetermination of the joint-and-several attorney's fees awarded against Rahmani and Rahmani Management, LLC, and do not reach the merits of appellants' fifth issue regarding sufficiency of the evidence to support attorney's fees.[16] *See Barker v. Eckman*, 213 S.W.3d 306, 313–15 (Tex. 2006).

## VI. Cross-point

In a single cross-point, Banet argues that the trial court abused its discretion by granting appellants' motion to disregard jury findings as to his

---

[16]The jury awarded $94,000 in attorney's fees plus $7,500 in conditional attorney's fees for an appeal to this court and $7,500 in conditional attorney's fees for an appeal to the supreme court, and the trial court entered judgment on this verdict and made appellants jointly and severally liable for these attorney's fees. The appellants were also jointly and severally liable for $200,000, while Rahmani individually was liable for $35,000.

24

breach-of-fiduciary-duty and fraud claims because there was adequate evidence to support both findings. Appellants reply that the economic loss rule precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract, and that because Banet argues in his appellate brief that he only asked for breach-of-contract damages with regard to these claims, only the breach-of-contract action could be pursued.

The contractual relationship of the parties may create duties under both contract and tort law, and their acts may breach duties in tort, contract, or both simultaneously. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). However, when the only injury is the economic loss to the subject of the contract itself, the action sounds in contract alone. *Id.* (holding that when the Reeds' injury was that the house they were promised was not the house they received, the cause of action was for breach of contract); *see also LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 242 n.35 (Tex. 2014); *cf. Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) ("[A] party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit.").

In Banet's live pleading at the time of the trial, Banet recited facts pertaining to breach of various agreements before setting out his claims for breach of those agreements, fraud as related to false representations of appellants' intention to pay him under those agreements, and breach of fiduciary

25

duty "to recover damages for the breach of the agreements outline[d] above, the value of the businesses and funds wrongfully converted as well as punitive damages for the intentional breach of such duties by Defendants."

The jury awarded $235,000 as damages for fraud based on "the difference, if any, between the amount paid by Rahmani pursuant to the contract and the amount owed Banet pursuant to the terms of the contract." The jury also awarded $235,000 as damages for breach of fiduciary duty, finding that a relationship of trust and confidence existed between Rahmani and Banet and that the transactions were not fair and equitable to Banet; that Rahmani did not make reasonable use of Banet's confidence in him; that Rahmani failed to act in the utmost good faith or exercise the most scrupulous honesty toward Banet; that Rahmani placed his own interests before Banet's, used the advantage of his position to gain a benefit for himself at Banet's expense, or placed himself in a position where his self-interest might conflict with his obligations as a fiduciary; or that Rahmani failed to fully and fairly disclose all important information to Banet concerning the transactions. As in the fraud damages question, the jury was asked to consider the difference, if any, between the amount paid by Rahmani "pursuant to the contract and the amount owed Banet," but this question also added "pursuant to the terms of the '*Transfer of Shares of the Partnership of WWWDH, L.P.*' and '*Agreement Between Henry Rahmani and Daniel Banet*'" contracts. The jury awarded no punitive or exemplary damages to Banet.

26

When a party fails to allege in its fraud claim that it suffered any loss independent of its contract damages, in the absence of an independent injury, its cause of action sounds only in contract. *Heil Co. v. Polar Corp.*, 191 S.W.3d 805, 816–17 (Tex. App.—Fort Worth 2006, pet. denied); *see also Fish v. Tex. Legis. Serv.*, No. 03-10-00358-CV, 2012 WL 254613, at *15 (Tex. App.—Austin Jan. 27, 2012, no pet.) (mem. op.) (applying economic loss rule to breach-of-fiduciary-duty claim when the damages alleged arose only from the nonperformance of duties governed by partnership agreement and claim was more appropriately characterized as breach of contract). Because Banet's fraud and breach-of-fiduciary-duty claims are barred by the economic loss rule, the trial court did not abuse its discretion by granting appellants' motion to disregard the jury findings on those claims, and we overrule his sole cross-point. *See Fish*, 2012 WL 254613, at *15; *Heil*, 191 S.W.3d at 816–17. *But see ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) (distinguishing damages that cross line from actual damages for breach of contract or fraud that redress specific harm to further, equitable return of contractual consideration when fiduciary breaches a contract).

## VII. Conclusion

Having sustained appellants' sixth issue in part, we modify the trial court's judgment to delete the $35,000 award against Rahmani, reverse the portion of the judgment awarding $94,000 in attorney's fees to Banet, and remand that portion of the judgment to the trial court for a new trial on attorney's fees. Having

27

overruled the remainder of appellants' dispositive issues and Banet's cross-point,

we affirm the remainder of the trial court's judgment as modified.

/s/ Charles Bleil
CHARLES BLEIL
JUSTICE

PANEL:  WALKER and MEIER, JJ.; and CHARLES BLEIL (Senior Justice, Retired, Sitting by Assignment)

DELIVERED:  May 7, 2015